PEOPLE v SUTTON (AFTER REMAND)

Docket No. 80844. Argued March 9, 1988 (Calendar No. 10). Decided
September 28, 1990. Rehearing denied 437 Mich 1208.

Robert M. Sutton was convicted by a jury in the Wayne Circuit
Court, Harold M. Ryan, J., of second-degree murder and posses-
sion of a firearm during the commission of a felony. The Court
of Appeals, initially reversed, finding error in the trial court's
instruction of the jury. The Supreme Court reversed and re-
manded the case to the Court of Appeals for consideration of
remaining issues. 428 Mich 858 (1987). On remand, the Court of
Appeals, WALSH, P.J., and BEASLEY and CYNAR, JJ., reversed in
an unpublished opinion per curiam, primarily on the ground
that the use for purposes of impeachment of the defendant's
failure to come forward and inform the police that he had shot
someone, but that it was an accident, and of his postarrest,
post-*Miranda* silence violated the rule of *People v Bobo,* 390
Mich 355 (1973) (Docket No. 98295). The people appeal.

   In an opinion by Justice BOYLE, joined by Chief Justice RILEY
and Justice GRIFFIN, and an opinion by Justice BRICKLEY, the
Supreme Court *held:*

   The decision of the Court of Appeals is reversed, and the
defendant's conviction is reinstated. In failing to object to the
prosecutor's cross-examination of the defendant regarding a
period after *Miranda* warnings had been given, defense counsel
waived any claim of error regarding the question, permitting
admission of the defendant's responses to it and to further
questions resulting from that question.

   Justice BOYLE, joined by Chief Justice RILEY and Justice
GRIFFIN, would further hold that impeachment of a defendant's
exculpatory testimony with pre- or postarrest, pre-*Miranda*
silence is permissible under the Michigan Constitution. Like-
wise, a defendant's right to remain silent is protected by the
Fourteenth Amendment preclusion of the use of a defendant's
silence following *Miranda* warnings to impeach exculpatory
testimony given at trial. In this case, however, the defendant
did not offer only exculpatory testimony, but affirmatively
stated and pursued the theory that he had made a postarrest
statement to the police that was consistent with his testimony
during trial. Neither the Fifth Amendment nor *Bobo* provides

immunity from contradiction. The prosecution was not precluded from rebutting the defendant's claims of postcustody statements consistent with accident with evidence of his post-*Miranda* warning silence.

The defendant has no standing to claim error on appeal in the impermissible use of silence when his position at trial was that he had not remained silent, but in fact had given a postarrest, postcustody statement that the shooting was an accident. Defense counsel waived any claim of such error, not only in failing to object to the prosecutor's cross-examination of the defendant, but also by thereafter affirmatively seeking to create the impression that the defendant's trial testimony that he had told the police that the shooting was an accident was truthful. Defendant thus converted a potentially objectionable situation into a claim of postarrest, postwarning conduct consistent with innocence. Impeachment with inconsistent conduct, the refusal to give a statement, was proper.

Defendant cannot assert that the Fifth or Fourteenth Amendment confers a right to create the impression, free from contradiction, that he coöperated with the police and made a statement after arrest. *Bobo* and *Doyle v Ohio,* 426 US 610 (1976), both grant a defendant the right to bar impeachment of the defendant's trial testimony where the government's impeachment theory is that maintaining silence is inconsistent with innocence. But both cases also expressly recognize that the bar to impeachment by silence of exculpatory trial testimony does not extend to impeachment with a refusal to speak during interrogation which is inconsistent with the defendant's own statements at trial claiming that postarrest statements were made while in custody.

Justice BRICKLEY, concurred in the result and analysis to the extent that the defendant's failure to object to the prosecutor's question on cross-examination waived any claim of error, but stated that the question itself was error as an attempt to use the defendant's postarrest, post-*Miranda* silence for impeachment.

Reversed; conviction reinstated.

Justice LEVIN, joined by Justices CAVANAGH and ARCHER, dissenting, stated that a defendant has a constitutional right not to be impeached with evidence of silence following the warnings prescribed by *Miranda v Arizona,* 384 US 436 (1966). Prosecutors who intend to introduce evidence of a defendant's pretrial silence should clearly limit questioning to the period before the *Miranda* warnings were given.

Analysis in this case should begin with and focus on the

prosecutor's initial inquiry during cross-examination of the defendant whether the defendant had informed the police that the shooting was an accident. It is that inquiry, not the defendant's testimony on direct examination, that set in motion the chain of events that culminated in the repeated introduction of the defendant's failure to inform the police that the shooting was an accident and of his exercise of the right to remain silent. It is manifest from the record that the prosecutor was attempting to bring out the defendant's silence. The record also indicates that the prosecutor failed to confine his initial inquiry on cross-examination to the constitutionally permissible pre-*Miranda* time frame. Where prosecutorial questioning has been found to refer to both pre- and post-*Miranda* silence, courts have found error under *Doyle v Ohio,* 426 US 610 (1976). The United States Constitution provides that a defendant has the right not to be impeached with post-*Miranda* silence. Prosecutors who intend to introduce evidence of a defendant's pretrial silence must clearly limit their questioning—with or without objection—to the period before *Miranda* warnings were given.

Under *People v Collier,* 426 Mich 23 (1986), the defendant's failure to inform the police that the shooting was an accident was inadmissible as not having probative value to impeach his direct testimony that the shooting was an accident. The defendant's exculpatory version of the events was incriminatory. Informing the police of his exculpatory version would have meant confessing to the commission of a crime. Under the circumstances, it would not have been natural for the defendant to have come forward. As a result, his failure to do so did not have probative value to impeach his testimony that the shooting was an accident, and such evidence was inadmissible for that purpose. When the prosecutor asked the defendant whether he had informed the police that the shooting was an accident, his manifest intention was to impeach the defendant's testimony that the shooting was an accident by showing that the defendant previously had not asserted this exculpatory version of the shooting. However, the defendant's silence, as defined by the prosecutor's initial inquiry, was not admissible for that purpose either under the United States Constitution or Michigan's evidence law. The defendant thus was asked a question to which either response would have led to the introduction of inadmissible evidence.

The defendant might have prevented the introduction of testimony concerning his silence if his lawyer had objected to the prosecutor's initial question on cross-examination. Thus it

could be said that the defendant waived his right not to be impeached with post-*Miranda* silence when his lawyer failed to object to the prosecutor's question. Under the circumstances of this case, however, there was a significant possibility that an objection would have conveyed to the jury that the defendant had not told the police that the shooting was an accident. Failure to take an action that might undermine the right not to be impeached with post-*Miranda* silence cannot fairly be deemed a waiver of the right not to be impeached with post-*Miranda* silence. In this case, the harm was in the asking. The prosecutor could not have introduced the challenged evidence in the case in chief, but sought on cross-examination of the defendant to put before the jury otherwise inadmissible evidence. There is no reason to distinguish between creating an impression through questioning and questioning to establish a predicate for the subsequent introduction of rebuttal testimony.

The reference was not an isolated occurrence, but also was made during closing argument, denying the defendant the right to a fair trial. The defendant's testimony on direct examination did not create the impression that when he was arrested he had been denied an opportunity to tell the police that the shooting was an accident. There is no basis for the suggestion that the testimony created an inference that legitimately could be rebutted by testimony about his post-*Miranda* silence, or the suggestion that the prosecutor's initial inquiry on cross-examination might have been permissible to test the credibility of the defendant's testimony on direct examination implying that he would have made an explanation consistent with his trial testimony but for the conduct of the police.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Criminal Division, Research, Training and Appeals, and *Don W. Atkins,* Principal Attorney, Appeals, for the people.

State Appellate Defender (by *Susan J. Smith*) for the defendant.

AFTER REMAND

BOYLE, J. The defendant has no standing to claim error on appeal in the impermissible use of silence when his position at trial was that he had *not* remained silent, but in fact had given a post-arrest, postcustody statement that the shooting was an accident.

Defense counsel waived any claim of such error. Not only did he fail to object to the prosecutor's cross-examination of the defendant, counsel thereafter affirmatively sought to create the impression that the defendant's trial testimony, that he had told the police that the shooting was an accident, was truthful. Therefore, impeachment with inconsistent conduct, the refusal to give a statement, was proper.

There is no conflict on this record between *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973), and federal decisions construing the Fifth and Fourteenth Amendments. Where a defendant claims that he gave an exculpatory statement to the police after arrest and warnings, neither *Bobo* nor any federal constitutional authority would preclude impeachment with prior inconsistent conduct, including silence. *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971). The Court of Appeals thus erred in holding that *Bobo* required reversal. On this point it has never been questioned that *Bobo* is coextensive with federal law. *People v Graham,* 386 Mich 452; 192 NW2d 255 (1971). We would therefore reverse the decision of the Court of Appeals and reinstate the defendant's conviction.

To the extent that the Court of Appeals relied on *Bobo* to conclude that the Fifth Amendment prevented impeachment with all reference to post-arrest silence, the court erred. As a matter of constitutional law, the federal and Michigan Constitutions do not preclude the use of a defendant's

prearrest or postarrest, pre-*Miranda*[1] silence for purposes of impeachment at trial. *People v Cetlinski,* 435 Mich 742; 460 NW2d 534 (1990). Nor is there any constitutional barrier to the impeachment use of postwarning silence where the defendant claims at trial that he did not remain silent but made statements to the police consistent with his exculpatory testimony. The prosecution cannot use postwarning silence to impeach a defendant's exculpatory trial testimony, but both *Bobo* and *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976), recognize that silence is admissible to impeach a defendant's claim that he did not remain silent. *Bobo, supra,* p 359.

To the extent the prosecutor's initial question might have been aimed intentionally at the defendant's postarrest, post-*Miranda* silence the question would have been objectionable under the rule of *Doyle* or *Greer v Miller,* 483 US 756; 107 S Ct 3102; 97 L Ed 2d 618 (1987).[2] To the extent the prosecutor's inquiry called for an irrelevant answer, it would have been objectionable under *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986). However, these issues cannot be addressed on this record.

The defendant's failure to object prevented development of a record that would allow us to decide whether the prosecutor's question was (1) a legitimate inquiry testing the credibility of defen-

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] However, had the prosecution intended to pursue an impermissible line of inquiry, no actual *Doyle* violation occurred in this case. The prosecutor's question produced the answer that the defendant had told the police it was an accident. Thus, there was not a *use* of the defendant's silence after invoking his *Miranda* rights, violative of the defendant's Fourteenth Amendment rights. Had the defendant objected, the question would be analyzed as an attempt to violate *Doyle* evaluated under the fair trial standards of *Greer, supra,* and *People v Sain,* 407 Mich 412; 285 NW2d 772 (1979).

dant's testimony on direct examination implying that he would have made an explanation consistent with his trial testimony but for the police conduct in "grabbing him," or (2) an attempt to make less probable the inference that the defendant sought to establish, i.e., that his prearrest conduct indicated his innocence, by exploring the defendant's statement on cross-examination that he had told Mr. Brandywine of the accident prior to going to the police and that he voluntarily went to the police. Thus, it is not possible to determine whether the inquiry was improper for constitutional or evidentiary reasons.[3]

We would resolve this case on the basis that the defendant failed to object and thereafter claimed that he had made a post-*Miranda* statement to the police consistent with his trial testimony. It was the defendant's position at trial that he did not remain silent. Moreover, the defendant affirmatively sought to establish that he did in fact make a pretrial statement and used that testimony to bolster his accident defense. Defendant thus converted a potentially objectionable situation into a claim of postarrest, postwarning conduct consistent with innocence. Evidence of Sutton's postarrest, postcustody behavior was permissibly used not to impeach defendant's exculpatory story, but rather to directly contradict the claim that defendant *had* told his story after arrest. *People v Bobo, supra; Doyle v Ohio, supra,* pp 619-620, n 11. "The shield provided by *Miranda* cannot be perverted

[3] The dissent observes there are only three possible responses by Sutton to the prosecutor's question when he told the police the shooting was an accident. (*Post,* pp 602-603.) There is, however, a fourth possibility: defendant could have responded that he did inform the police and this statement was made prearrest and pre-*Miranda.* This logical fallacy of the dissent is the assumption that the question called for a response directed at post-*Miranda* silence. Rather, the question was directed at conduct inconsistent with trial testimony which could have occurred prior to or subsequent to arrest.

into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris, supra,* p 226.

I

On February 14, 1982, the defendant, accompanied by the lawyer who ultimately became trial counsel, voluntarily came to the Taylor police station after learning that the police wanted to question him regarding the shooting death of Milton Taylor which took place the previous evening during a dance the defendant had attended with his brother. Upon arrival at the station, the police arrested the defendant and charged him with first-degree murder.

At the defendant's trial,[4] the prosecution presented proofs that prior to the shooting incident, which took place sometime after midnight, the defendant's brother and the victim began to fight. As people tried to break up the fight, a shot was fired, hitting the victim. A witness testified that he saw the defendant pull out a gun and shoot the victim.[5] The prosecutor also called Sergeant Thomas Bonner. He testified that, as part of the investigation, he had learned that the deceased uttered the words, "Sutton shot me, Thomas Sutton shot me." The officer further testified that he learned that David Sutton, the defendant's brother, had no brother named Thomas and that he and the defendant were the only Suttons.[6]

---

[4] The defendant's trial took place in February of 1984. The defendant failed to appear for his originally scheduled trial on June 16, 1982.

[5] The shot had been fired from a gun the defendant's brother had brought with him to the dance. The defendant testified that during the evening his brother asked him to hold the gun he had brought to use as protection while collecting and transporting the proceeds of the dance.

[6] Another witness testified that she had tried to help the victim

During cross-examination of Sergeant Bonner, defense counsel began to suggest defendant's coöperation with the authorities by establishing that the defendant had initially voluntarily submitted himself to the police and was immediately charged with the crime, and further, that the defendant had voluntarily returned from Ohio following his flight from prosecution.[7] No reference was made by the prosecution to any conduct of the defendant which might be construed as silence. The prosecution rested.

The defendant took the stand and on direct examination by his counsel said that his brother had given him the gun to hold during the dance, and that around 2:00 A.M., while he was helping collect money from people at the doorway, somebody said a fight had started. The defendant stated that he rushed over when he saw that it was his brother fighting and that he pulled out the gun, and said " 'Why don't somebody stop the fight?' " At that point while he was trying to move closer to where his brother was fighting, the defendant stated that someone hit him and knocked the gun out of his hand. As he fell against one of the tables and tried to catch his balance he heard a weapon discharge. Defendant testified that he last saw the gun in the possession of a person named Hansbury. He stated that he left the dance approximately one-half hour later, and that he never knew that anyone had been shot until the next day. The defendant testified that his only interest had been to protect his brother, and asserted that when he heard that someone had been shot he

after he was shot. She also stated that when she asked the victim who had shot him he said "Sutton," and that when she asked again he said "Thomas Sutton."

[7] Sutton had failed to appear on the original trial date and was subsequently arrested in Ohio in August of 1983 and returned for trial.

voluntarily went to the police department. He
implied that he was prevented from relating his
exculpatory version of the event when he added
that he had no idea that he was going to be
charged with murder and that Sergeant Bonner
"just grabbed me" and said, " 'You are being
charged with first-degree murder.' "[8] During cross-
examination the defendant said that he did hear
the gun go off after he dropped it, and that he did
not look for the gun after he regained his balance
and was on his feet. After composing himself, he
looked around and saw a Mr. Hansbury walking
down a hallway holding the gun. The prosecutor
then asked:

> *Q.* You are telling me as soon as you got up
> from the table, Mr. Hansbury had the gun?
> *A.* When I seen [sic] him, he had it.
> *Q.* And what was Mr. Hansbury doing with the
> gun?
> *A.* He was walking down the hallway with it.
> *Q.* Did he give it to you?
> *A.* No, sir.
> *Q.* Did you ask him for it?
> *A.* No, sir.
> *Q.* How many people *at that point,* Mr. Sutton,
> did you tell that [it] was an accident, [that] the
> gun was knocked from your hand?
> *A.* I told Mr. Brandywine.[9]

The prosecutor also asked:

> *Q.* How many times did you inquire when you
> composed yourself from hitting that table, how
> many times did you inquire if anyone got shot
> because the gun went off?

[8] The defendant also stated that he did not fight extradition and
that he came back from Ohio voluntarily.

[9] Mr. Brandywine did not indicate that the defendant spoke with
him at all after the shooting.

*A.* I asked Mr. Brandywine.

The following colloquy then occurred:

*Q.* Now, when, Mr. Sutton, did you first learn that someone had been shot at the Fandango Hall?
*A.* The day after the cabaret.

\* \* \*

*Q.* When did you tell the police it was an accident?

\* \* \*

*A.* I can't remember exactly when.
*Q.* You did tell the police?
*A.* Yes.
*Q.* Do you have any idea when you told the police?
*A.* No. I can't remember.
*Q.* Do you have any idea what police you told?
*A.* Sergeant Bonner.
*Q.* Sergeant Bonner?
*A.* Yes.
*Q.* What year was that, sir?
*A.* '82.
*Q.* '82. Was that the same month of the shooting at the hall?
*A.* I think so, yes.
*Q.* Well, how did that occur? Did you call the police and tell them what happened?
*A.* I was in police custody.

At this point, although no objection was made, the prosecutor asked no more questions regarding this subject.

Thereafter the defendant rested. The prosecutor recalled Sergeant Bonner and asked one question, that is, "at any time in 1982, did this defendant, ever, Mr. Sutton, ever, tell you that the shooting at the Fandango Hall was an accident?" No objection was interposed, and Sergeant Bonner re-

sponded, "No he did not." Defense counsel then cross-examined the witness and asked a series of questions suggesting that the defendant had told Sergeant Bonner the shooting was an accident when he was out of defense counsel's presence and that the Sergeant was lying when he said otherwise. Defense counsel's first question on recross was:

> *Q.* [*Mr. Henry*]: Sergeant Bonner, first of all, when I brought Mr. Sutton out there to you, you took him off to mug him and do whatever else had to be done out of my presence?
> *A.* Yes, sir.
>
> \*   \*   \*
>
> *Q.* So then what—when he said he told you it was an accident and you said he didn't tell you, then, it is you and him, he is lying. You can't be lying?
> *A.* I am not lying.
> *Q.* I know that you are just like Caesar's wife, honest and impeccable to the very last. You wouldn't say anything wrong?
> *A.* I am telling you the truth. I don't know what you want.
> *Q.* I know. I know.
>
> \*   \*   \*
>
> *Q.* But you are [sure] of what he said? Did he ever tell you that he deliberately shot anybody?
> *A.* No. He didn't say that, either.
>
> \*   \*   \*
>
> [*Q.*] Well, if you were so anxious to protect his rights, why couldn't I have gone back with him while you were there fingerprinting him and going through these very items with him? What reasons do you have to keep me from going back with him?

Once again the prosecution recalled Sergeant Bonner for a single question. When asked if the defendant had made any statement, Bonner re-

sponded that after receiving warnings regarding his constitutional rights the defendant said he did not want to make any statements. No objection was made, and again defense counsel recross-examined Sergeant Bonner and pursued a line of questioning which implied that the defendant had told the detective of his claim of accident when he was separated from counsel at the police station for the purpose of fingerprinting, that Bonner was "running around trying to get people . . . to come in and testify against him," and then concluded, "You are not supposed to make up a case."

In his closing argument, the prosecutor without objection referred to the fact that the police officer indicated that the defendant had not made a statement to the police that the shooting was an accident.[10] In closing, defense counsel stated,

> He said that he told them it was an accident. To say that he didn't make a formal statement when I am the one that said we don't want any formal statements made, period, and that's my judgment, not his.
>
> But when they take him back to talk to him, to fingerprint him, what-not, he said that he told them it was an accident.
>
> But who in the world—How do you think they are ever going to believe him. They still are charging him with first-degree murder. They have shown him nothing but this hard side of the mountain. That's all they want to do.

Defendant Sutton was convicted by a jury of

---

[10] In his closing argument, the prosecutor stated:

> He also told us back in 1982, when the defendant was originally arrested, that the defendant never indicated to him that the shooting was an accident, but, in fact, indicated to him that he had nothing to say, no statement.

second-degree murder[11] and possession of a firearm during the commission of a felony,[12] and subsequently was sentenced to prison terms of eight to twenty years and two years. The Court of Appeals reversed the convictions and held that the Fifth Amendment precluded cross-examining the defendant regarding when he had told the police the shooting was an accident.[13] Specifically noting *Collier* and citing *Bobo,* the panel observed that the *Collier* decision "does not cast doubt on this Court's application of the *Bobo* rule" and found,

> By asking defendant when he told the police that the shooting was an accident, the prosecutor infringed on defendant's constitutional right to remain silent.

The panel concluded that the prosecutor's argument deprived the defendant of a fair trial, citing *People v Sain,* 407 Mich 412; 285 NW2d 772 (1979).[14]

## II

The sequence of events in the instant case is critical to our conclusion that error, if any, was

---

[11] MCL 750.317; MSA 28.549.

[12] MCL 750.227b; MSA 28.424(2).

[13] *People v Sutton (On Remand),* unpublished opinion per curiam of the Court of Appeals, decided April 28, 1987 (Docket No. 98295).

On initial appeal, the Court of Appeals reversed the defendant's convictions, finding an error under *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975), on the basis of the trial court's failure to instruct, sua sponte, regarding the defendant's accidental shooting theory. *People v Sutton,* unpublished opinion per curiam of the Court of Appeals, decided April 24, 1986 (Docket No. 81069). This Court reversed the Court of Appeals judgment, reinstated the defendant's convictions, and remanded the case to the Court of Appeals for consideration of the remaining issues. 428 Mich 858 (1987).

[14] This Court granted leave to address the issue whether the cross-examination violated the defendant's rights under the federal or Michigan Constitutions. *People v Sutton,* 429 Mich 858 (1987).

waived. After direct examination of the defendant by defense counsel, the prosecutor directed cross examination to the defendant's testimony on direct examination that the shooting was an accident. After the defendant testified that he told Mr. Brandywine the gun was accidentally knocked from his hand, the prosecutor asked Sutton when he told the police the shooting was an accident. It was at this point that the defendant testified that he made a postarrest, postcustody statement to Sergeant Bonner consistent with the exculpatory story he was now giving at trial.

After the defense rested, the prosecutor recalled Sergeant Bonner and asked one carefully worded question—whether Sutton ever told Bonner that the shooting was an accident, and Sergeant Bonner replied that he had not. All this was done without objection by defense counsel.

At this point, defense counsel cross-examined Sergeant Bonner and asked a series of questions suggesting that Sutton had made such a statement out of his attorney's presence and inferring that Sergeant Bonner was lying. Once again, on surrebuttal, the prosecution asked a single question— whether the defendant had made any statement to Sergeant Bonner. Sergeant Bonner responded that after giving Sutton *Miranda* warnings, Sutton said he wished to make no statement.

Presumably, both counsel were surprised by Sutton's answer, since there is no record evidence that Sutton said anything to the police. When, contrary to what the lawyers presumably anticipated, Sutton claimed that he had made such a statement to the police, the prosecutor was faced with the following conundrum, i.e., how to counter that statement without making reference to the defendant's exercise of his Fifth Amendment privilege against compelled self-incrimination. The

prosecutor did that in the only way he could—by asking the officer one carefully worded question— whether the defendant had told the officer the shooting was an accident.[15]

Defense counsel then had a tactical decision to make: (1) either to object to further questions and drop the subject or (2) to permit the questions to proceed and attempt to buttress his client's testimony by suggesting through his own examination of the police officer that the statement was in fact made. Defense counsel chose the latter course by suggesting through his cross-examination of Bonner that Bonner was lying and then resting without recalling his client. The prosecutor's single question of Sergeant Bonner on redirect examination was directly responsive to defense counsel's tactical decision.

The same able and experienced retained counsel who represented defendant when he surrendered to the police and who advised defendant not to make a statement, did not object to the question regarding whether defendant had told the police as well as Mr. Brandywine his exculpatory version

[15] Contrary to the conclusion that impeachment with prior inconsistent conduct was not the prosecutor's goal because he failed to inquire further about Sutton's alleged statement, *post*, p 604, n 11, the prosecutor did ask *when* Sutton told the police about his story, *who* he told, *what* year and month he made the statement, and *how* it came about that he made such a statement. It was only after these additional questions were asked that the prosecutor ended his inquiry. Moreover, all these questions were asked and answered without objection from defendant.

The fact that the prosecutor did not go further is perhaps explained by the fact that he knew Sutton had not made a statement. Thus, rather than bring out what Sutton had purportedly said through Sutton's own words on cross-examination, he wisely left to defense counsel the choice whether to drop the subject or to pursue an inquiry regarding what Sutton actually said. Defense counsel chose to pursue the *content* of the purported statement through suggestive questioning of Bonner. It is not *who* was questioned, but the fact that the theory was pursued that evidences the tactical decision of defense counsel. (*Post*, pp 606-607.)

of the event.[16] Nor did counsel object to seven subsequent questions regarding the same subject matter. Counsel thereafter strategically and affirmatively employed the defendant's answer that he told the police, "when he was in custody," that the shooting "was an accident" to buttress the accident defense. It is our conclusion that the defendant intentionally waived any plausible objection and thus invited impeachment with his inconsistent postarrest, postcustody behavior.

Defendant cannot assert that the Fifth or Fourteenth Amendment confers a right to create the impression, free from contradiction, that he coöperated with the police and made a statement after arrest. *Bobo* and *Doyle* both grant a defendant the right to bar impeachment of the defendant's trial testimony where the government's impeachment theory is that maintaining silence is inconsistent with innocence. But both cases also expressly recognize that the bar to impeachment by silence of exculpatory trial testimony does not extend to impeachment with a refusal to speak during interrogation which is inconsistent with defendant's own statements at trial claiming that he made postarrest statements while in custody. As the court observed in an analogous situation in *United States v Fairchild*, 505 F2d 1378, 1383 (CA 5, 1975), on this record, there is no doubt that "the bar was lowered and [the defendant] discarded the shield which the law had created to protect him."

The fact that a defendant's silence might ini-

---

[16] It is arguable that defendant had already opened the door to a full, and not merely selective, development of the subject of coöperation which he himself broached during his direct testimony. Assuming, however, that defendant had not yet opened the door, a timely objection to the prosecutor's question on cross-examination would have at a minimum forced the prosecutor to clarify the theory on which he based the impeachment. An objection might have resulted in a direction from the trial court that the prosecutor's question was to be limited to the prearrest pre-*Miranda* warning period.

tially have been excluded for constitutional reasons does not grant a defendant immunity from impeachment with inconsistent conduct:

> Constitutional rights, like others, may be waived; and a criminal defendant may, by his conduct, make otherwise constitutionally inadmissible evidence admissible for certain purposes. *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971). Here the evidence of Fairchild's *Miranda* silence was admissible for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with the law enforcement authorities. Thus, it was not error for the trial court to admit Detective Hobbs' testimony concerning Fairchild's silence at the police station following his *Miranda* warnings. [*Fairchild, supra,* p 1383.]

United States Supreme Court cases decided subsequent to our holding in *Bobo* establish that when a defendant takes the stand and testifies the privilege against self-incrimination is waived and the defendant may be impeached with both prearrest silence and postarrest pre-*Miranda* silence without violating the Fifth Amendment. *Jenkins v Anderson,* 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980); *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982) (per curiam).

Where silence follows *Miranda* warnings, Fourteenth Amendment due process bars the use of such evidence to impeach a defendant's exculpatory explanation at trial provided that the defendant does not claim "to have told the police the same version upon arrest." *Doyle v Ohio, supra,* pp 619-620, n 11. Thus *Doyle* establishes that the discrepancy between a defendant's exculpatory story at trial and his postarrest, postwarning silence is not available to the state to impeach the credibility of the defendant's exculpatory testi-

mony. In this situation, silence has no probative value because "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Doyle,* p 617. Moreover, it is fundamentally unfair to use a defendant's silence against him when he had been implicitly promised that if he remained silent he will not be penalized.

The *Doyle* Court, however, carefully distinguished the situation before it from a case in which a defendant claims to have told the police the same version upon arrest.[17] Citing *United States v Fairchild, supra,* p 1383, the Supreme Court observed:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. [*Doyle, supra,* p 619, n 11.][18]

The Supreme Court has consistently held, in the context of testimony substantively inadmissible

---

[17] In *Anderson, Warden v Charles,* 447 US 404; 100 S Ct 2180; 65 L Ed 2d 222 (1980) (per curiam), the Court held it was not a violation of due process for the state to admit evidence of the defendant's post-arrest post-*Miranda* statement if there is a factual inconsistency between the defendant's postarrest statement and his trial assertions. *Id.,* p 409. Further, in 1982, the Court decided in *Fletcher v Weir, supra,* p 607, that postarrest silence could be used for impeachment purposes when it did not appear from the record that *Miranda* warnings had been given.

[18] The dissent asserts at *post,* p 616 that this exception in *Doyle* is not applicable here because it was on cross-examination and not direct examination that Sutton testified that he had informed the police that the shooting was an accident. The *Doyle* Court, however, made no such distinction.

because of a violation of the prophylactic rules implementing the Fourth Amendment, *Walder v United States,* 347 US 62; 74 S Ct 354; 98 L Ed 503 (1954), Fifth Amendment, *Harris v New York, supra,* and the Sixth Amendment, *Michigan v Harvey,* 494 US —; 110 S Ct 1176; 108 L Ed 2d 293 (1990), that the defendant may not turn the illegality "to his own advantage, and provide himself with a shield against contradiction of his untruths," *Walder, supra,* p 65. Most recently the Supreme Court has held that a statement inadmissible in the prosecution's case in chief because it was obtained in violation of the rule protecting defendant's Sixth Amendment right to counsel, *Michigan v Jackson,* 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986), may be used to impeach a defendant's false or inconsistent testimony, *Michigan v Harvey, supra,* 108 L Ed 2d 303, observing, "[w]e have never prevented use by the prosecution of relevant voluntary statements . . . ."

To the extent that the Court of Appeals may have concluded that *Bobo* precluded impeachment with silence inconsistent with a defendant's trial testimony that he had made a statement while in custody, the decision was inconsistent with *Doyle, Graham,* and *Bobo* itself.

III

Had an objection been interposed, the burden would have been on the prosecutor to establish that there was a permissible line of relevant inquiry either for use during cross-examination or as a foundation for proper impeachment.[19] Thus, had

---

[19] Some courts hold that where postarrest post-*Miranda* silence is arguably in question, the burden is on the prosecutor to establish that there is a permissible line of inquiry. In *State v Lofquest,* 227 Neb 567; 418 NW2d 595 (1988), the prosecutor's questions and statements

objection been made, the prosecutor might have failed to establish that the question was permissible cross-examination or have succeeded in establishing that the question was directed to permissible impeachment. However, no objection was interposed following the prosecutor's initial question, and the defendant responded that he *had* told police that the shooting was an accident.[20] Nor was any objection made to seven subsequent questions regarding the same subject. Had defendant objected and the objection been overruled, our task would have been to decide whether there was a permissible basis for cross-examination or a lawful basis for impeachment. If there was neither, we would have had to decide whether the error was of an evidentiary or a constitutional nature and, if constitutional, whether the trial was so tainted that reversal was required.[21] *People v Manning,* 434 Mich 1; 450 NW2d 534 (1990).

were directed specifically to the postarrest time period. Over defense counsel's objection, the prosecutor continued with a line of questioning and remarks as to what police might have done had the defendant told his story as he should have, and the court found *Doyle* error on the basis that it was impossible to discern for purposes of a *Doyle* inquiry, what period of silence the prosecutor was referring to, pre-*Miranda* or post-*Miranda. Id.,* p 570. See also *United States ex rel Allen v Franzen,* 659 F2d 745 (CA 7, 1981), cert den 456 US 928 (1982). Further, in both *Lofquest* and *Franzen* credibility was closely contested, and the prosecutorial comments and questions, directed to the postarrest time periods, made it impossible to determine whether the references were to silences occurring during the pre- or post-*Miranda* time periods and constituted violations of the defendants' rights to due process.

[20] No "use" was made of defendant's silence because defendant claimed he had not remained silent. In constitutional terms, the prosecutor's inquiry might only have been a *Greer* error, i.e., an intentional attempt to use the defendant's silence, requiring reversal where it has so infected the process as to deprive defendant of a fair trial. It might also have been a permissible reference to prearrest silence.

[21] It could fairly be said that both the defense and prosecuting attorneys engaged in sharp practice. Had the prosecutor made affirmative use of the defendant's silence in his closing argument, and the defendant had objected, *People v Sain, supra,* might require reversal. The record, however, does not reveal "that the prosecutor seized upon

However, defendant not only failed to object, but made affirmative use of his testimony that he had not remained silent, thus waiving any error.[22] To directly contradict Mr. Sutton's testimony that he told Sgt. Bonner it "was an accident" "when I was in custody," Sergeant Bonner was recalled in rebuttal and asked one question, "At any time in 1982, did this defendant, ever, Mr. Sutton, ever, tell you that the shooting . . . was an accident?" Defense counsel again did not object. On cross-examination, defense counsel thereafter suggested that the defendant had made consistent exculpatory statements when Bonner separated defendant from counsel to fingerprint him, asking Bonner:

> Well, if you were so anxious to protect his rights, why couldn't I [defense counsel] have gone back with him while you were there fingerprinting him . . . ? What reasons do you have to keep me from going back with him?

The first mention of "silence" was offered to directly contradict this examination.[23] Defendant's position at trial, pursued throughout testimony

the response of the police officer and used it to maximum advantage." Here, unlike in *Sain,* the prosecutor did not "clearly and repeatedly ask[] the jury to consider, as a factor in favor of a finding of guilt, that the defendant, when confronted by the police at the time of his arrest, remained silent." *Id.,* pp 415-416.

[22] Thus, *Lofquest* and *Franzen* are distinguishable from the facts and issues presented in *Sutton.* Unlike the instant case, in *Lofquest* and *Franzen* the defendant did *not* testify at trial that he gave a statement to the police that was consistent with his exculpatory story given at trial. As noted in *Doyle, supra,* pp 619-620, n 11, in *Sutton* the defendant's silence was not used to impeach his exculpatory story given at trial. Rather, it was used to impeach the defendant's trial testimony that he gave that exculpatory story "while in custody" with his inconsistent behavior following his arrest. Thus, there could be no *Doyle* error.

[23] In *United States v Havens,* 446 US 620; 100 S Ct 1912; 64 L Ed 2d 559 (1980), the Supreme Court rejected the claim that rebuttal evidence was limited to contradiction of a particular statement made by a defendant during his direct examination. The court held that "a defendant's statements made in response to proper cross-examination

and in closing argument, was that he had not been silent, but had maintained his theory of innocence, even to the police and even while in police custody. This testimony, if believed by the factfinder, would surely be seen as significantly enhancing the truthfulness of the defendant's accident defense and of the defense sub theme that the police had "pinned" the crime on an innocent man. For precisely this reason, we can find no fundamental unfairness in admitting evidence of the defendant's inconsistent conduct in declining to make a statement.

reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." *Id.,* pp 627-628.

We agree with Chief Justice RILEY's position in *People v Dyson,* 106 Mich App 90; 307 NW2d 739 (1981). The facts in *Dyson* are similar to those in *Sutton.* In *Dyson,* the defendant took the stand and presented an alibi defense. He was then asked on cross-examination whether he told his alibi to the complainant when she identified him, and he responded that he had. Moreover, he testified that he also told the police when they first stopped him. On redirect examination, the defendant maintained that he attempted to tell the officers but they told him to "shut-up." On recross-examination, the defendant testified that he offered his story to the police but they were not interested in hearing it.

In rebuttal to the defendant's testimony, the prosecution recalled the two arresting officers. In response to narrow specific questions, both testified contrary to the defendant's testimony that he had not told them at the time of arrest of his alibi. The *Dyson* Court concluded, "[o]n these facts, we find that the officers' testimony was proper rebuttal testimony. . . . Having concluded that the testimony of the police officers was admissible to impeach defendant's own inconsistent statements at trial, we also conclude that it was properly brought in as rebuttal testimony." *Id.,* pp 95-96.

Like the defendant in *Dyson,* Sutton attempted to bolster his accident defense by testifying that he previously told his exculpatory story to the police officers "while in custody." Thus, the *Dyson* Court's conclusion applies here as well. "The rebuttal testimony of the officers was that he had not told them. It was a simple contradiction of defendant's testimony that directly tended to disprove the exact testimony given by the witness. As so limited, it was proper rebuttal testimony, serving to impeach defendant on a material and relevant matter." *Id.,* p 97. But see contra *People v Pelkey,* 129 Mich App 325; 342 NW2d 312 (1983).

Inquiry regarding postarrest post-*Miranda* silence is not error where the prosecutor is seeking not to impeach the defendant's exculpatory story with silence, but rather to challenge the defendant's trial testimony regarding his postarrest behavior.[24] Indeed, *Doyle* itself recognizes that impeachment with postarrest post-*Miranda* silence is permissible to contradict a defendant's trial testimony of an exculpatory version of events and claim that the same story had been told on arrest, an exception recognized by this Court in *People v Graham, supra,* whose continued vitality was approved in *Bobo* itself, p 359. We reiterate the Court's observation in *Doyle:*

It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In

[24] See, e.g., *United States v Conlin,* 551 F2d 534 (CA 2, 1977), cert den 434 US 831 (1977); *Summit v Blackburn,* 795 F2d 1237 (CA 5, 1986); *United States v Dixon,* 593 F2d 626, 629 (CA 5, 1979), cert den 444 US 861 (1979).

In *United States v Fairchild, supra,* p 1383, the court concluded that defense counsel's elicitation from a police agent during cross-examination that his client had no criminal record and had voluntarily provided handwriting samples, followed by the question, " 'During the period of time that this investigation has been going on, to your knowledge has Mr. Fairchild cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted?' " permitted impeachment with postarrest silence.

See also *United States v Mavrick,* 601 F2d 921, 932 (CA 7, 1979), in which the defense counsel elicited the following testimony from the defendant in his direct examination:

"*Q.* Did you attempt at the time of your arrest to explain your conduct to those officers who were taking you into custody?

"*A.* Yes, we did.

"*Q.* Did they give you an opportunity at that time to speak?

"*A.* No, they told us to shut up, and they don't want to hear it."

that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v Fairchild,* 505 F2d 1378, 1383 (CA 5, 1975). [*Doyle v Ohio, supra,* p 619, n 11.]

The constitution protects the rights of all. It does not license a defendant to present testimony directly contradictory of other proven facts to the factfinder, free from the risk that he will not be impeached. "It goes almost without saying" that at the bottom of this is the claim of a constitutional right to immunity from contradiction, a claim that has not been endorsed by this Court or any other.

### CONCLUSION

Construing *People v Bobo* as coextensive with federal precedent, we hold that impeachment of exculpatory testimony with pre- or postarrest, pre-*Miranda* silence is permissible under the Michigan Constitution. Likewise, a defendant's right to remain silent is protected by the Fourteenth Amendment which precludes the use of a defendant's silence following *Miranda* warnings to impeach an exculpatory story.

However, defendant Sutton did not offer only an exculpatory story, but affirmatively stated and pursued the theory that he had made a postarrest, post-*Miranda* warning statement to the police consistent with his trial testimony. Nothing in the Fifth Amendment or *Bobo* itself allows a defendant to so testify free from contradiction.

In these circumstances, the prosecution was not precluded from rebutting defendant's claims of postcustody statements consistent with his accident defense with evidence of the defendant's post-warning silence. Defendant chose to make affirma-

tive use of his purported coöperation with the police and thus waived the protection the constitution would otherwise have afforded.

Accordingly, we reinstate the defendant's conviction.

RILEY, C.J., and GRIFFIN, J., concurred with BOYLE, J.

BRICKLEY, J. (*concurring*). The record before us has been sufficiently developed for the Court to rule on whether the prosecutor's question on cross-examination was in fact error. On this issue I agree with Justice LEVIN that the question itself constituted error because it was an attempt by the prosecutor to use defendant's postarrest, post-*Miranda* silence for impeachment.

However, I concur in the result reached by Justice BOYLE because defendant waived any claim of error. I join in her analysis to the extent that defendant's failure to object to the prosecutor's question on cross-examination pointing to a post-*Miranda* period waived any claim of error as to the question posed. I therefore also agree with Justice BOYLE's analysis regarding admissibility of defendant's responses and further questioning resulting therefrom.

LEVIN, J. (*dissenting*). Sutton was convicted of second-degree murder[1] and possession of a firearm during the commission of a felony.[2] The Court of Appeals reversed Sutton's convictions primarily on the ground that the impeachment use of his failure to come forward and inform the police that he had shot someone, but that it was an accident, and

[1] MCL 750.317; MSA 28.549.
[2] MCL 750.227b; MSA 28.424(2).

of his postarrest, post-*Miranda*[3] silence, violated the rule stated in *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973).

This case was consolidated on appeal with *People v Cetlinski,* 435 Mich 742; 460 NW2d 534 (1990), and *People v McReavy,* 436 Mich 197; 462 NW2d 1 (1990). In *Cetlinski,* the Court held that it was bedtime for *Bobo* which henceforth is to be construed coextensively with the minimal requirements of the United States Constitution.[4] The Court also held that the *impeachment* use of a defendant's "statement, including omissions," during prearrest conversations with law enforcement personnel did not violate Cetlinski's rights under the United States or Michigan Constitution.[5] In *McReavy,* the Court held that the *substantive* use of a defendant's "demeanor and statements" during custodial interrogation did not violate McReavy's rights under the United States or Michigan Constitution.[6]

This case concerns the correct judicial response

---

[3] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[4] We therefore construe *Bobo* as being coextensive with the Fifth Amendment of the United States Constitution and the due process analysis of *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976). [*Cetlinski, supra,* pp 759-760.]

[5] We hold that the use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police, prior to arrest or accusation, does not violate the defendant's constitutional rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution. [*Cetlinski, supra,* pp 746-747.]

The Court added that "[t]he use of a defendant's prearrest, pre-*Miranda* 'statements' for impeachment purposes is one of relevancy, an evidentiary matter." *Id.,* p 747.

[6] The admission for substantive purposes of evidence of the defendant's demeanor and statements made during custodial interrogation after a valid waiver of his Fifth Amendment privilege against compelled self-incrimination and prior to invoking the right to remain silent is neither error of constitu-

where the prosecutor, by asking a question on cross-examination of the defendant, assures that inadmissible matter will be presented to the jury. The prosecutor, knowing that a police officer would testify that Sutton had not told the police that the shooting was an accident,[7] asked Sutton whether he had so informed the police. Either:

—Sutton would respond that he had not so informed the police; such a response would convey to the jury that Sutton did not, after he had received the *Miranda* warnings,[8] tell the police that the shooting was an accident, which would have been violative of the United States Supreme Court's decision in *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976); such a response might also convey to the jury that Sutton did not, before he was arrested and given the *Miranda* warnings,[9] tell the police that the shooting was an accident, which would have been violative of the interpretation of *Bobo* that prevailed when Sutton was tried; or

—Sutton's lawyer would object to the question, and the objection would be sustained, with the result that the jury would assume that Sutton did not tell the police that the shooting was an accident; this would have the same effect as a practical matter as if Sutton's lawyer had not objected and Sutton had testified that he did not so inform the police; or

---

tional dimension nor a violation of the Michigan Rules of Evidence. [*McReavy, supra,* p 203.]

The Court added that "[w]hen constitutional obligations are fulfilled, use of a party opponent's statements and conduct are to be evaluated pursuant to MRE 801." *Id.,* p 222.

[7] See *ante,* pp 589-590 and n 15 (quoted in n 18).

[8] The prosecutor's inquiry on cross-examination referred to both the pre- and post-*Miranda* time frame. See part II(B)(1).

[9] Cf. *ante,* p 581, n 3.

—Sutton would respond that he did inform the police that the shooting was an accident, and the prosecutor would call the police officer who would testify that Sutton did not so inform the police. That is what occurred in this case.

Thus, by asking the question, the prosecutor assured that—regardless of what Sutton or his lawyer did or did not say—the jury would learn that the prosecutor claimed that Sutton had not informed the police that the shooting was an accident. This case does not involve *Cetlinski, McReavy,* or *Bobo.* It involves *Ignofo.*[10] We agree with the Court of Appeals that Sutton did not receive a fair trial, and affirm.

I

Sutton's convictions stem from a shooting at a party during the early morning hours of February 13, 1982. During the people's case in chief, the prosecutor presented evidence that immediately before the shooting there was a fight between the decedent and Sutton's brother and that as other persons were attempting to break up the fight a shot was fired, hitting the decedent. One witness testified that he saw Sutton pull a gun and shoot the decedent.

Sutton claimed the shooting was accidental. On direct examination, he testified that he had taken the gun in hand in an attempt to break up the fight between his brother and the decedent. He said that someone knocked him into a table causing him to drop the gun and that the gun discharged when it hit the floor. He said that on the night of the incident he did not know that anyone

---

[10] *People v Ignofo,* 315 Mich 626; 24 NW2d 514 (1946). See ns 35-39 and the accompanying text.

had been shot and that when he left the party the police had not arrived.

On cross-examination, the prosecutor sought to impeach Sutton's testimony by asking him when he first told the police the shooting was an accident. Sutton responded that while "in police custody" in February, 1982, he informed Sergeant Bonner, the arresting officer, that the shooting was an accident.[11] Sutton's lawyer did not object.

After the defense rested, the prosecutor recalled Bonner who testified that Sutton did not at any time in 1982 tell him the shooting was an accident.[12] Sutton's lawyer did not object. On cross-examination, Sutton's lawyer implied that Bonner was lying and that the police had kept the lawyer from Sutton when Sutton was being processed at the police station. Once again, the prosecutor

---

[11] Q. When did you tell the police it was an accident?
A. When did I tell the police it was an accident?
Q. Yes.
A. I can't remember exactly when.
Q. You did tell the police?
A. Yes.
Q. Do you have any idea when you told the police?
A. No. I can't remember.
Q. Do you have any idea what police you told?
A. Sergeant Bonner.
Q. Sergeant Bonner?
A. Yes.
Q. What year was that, sir?
A. '82.
Q. '82. Was that the same month of the shooting at the hall?
A. I think so, yes.
Q. Well, how did that occur? Did you call the police and tell them what happened?
A. I was in police custody.

[12] Q. Sergeant Bonner, one question. At any time in 1982, did this defendant, ever, Mr. Sutton, ever, tell you that the shooting at the Fandango Hall was an accident?
A. No. He did not.

called Bonner who testified that he gave Sutton the *Miranda* warnings, and that Sutton said that on the advice of his lawyer he did not want to make a statement.[13] Again, Sutton's lawyer did not object.

In closing argument, the prosecutor, without objection, referred to both Sutton's failure to relate his exculpatory version to the police when he was arrested and Sutton's exercise of the right to remain silent.[14]

The Court of Appeals reversed Sutton's convictions on the grounds that the prosecutor violated *Bobo* by asking Sutton when he told the police the shooting was an accident, and that Sutton had been denied a fair trial in light of the prosecutor's cross-examination, Bonner's testimony that when advised of his *Miranda* rights Sutton told him he did not wish to make a statement, and the prosecutor's reference in closing argument to Bonner's rebuttal testimony.

II

Analysis should begin with and focus on the prosecutor's initial inquiry—during cross-examination of Sutton—whether Sutton had informed the police that the shooting was an accident.[15] It is

[13] *Q.* In fact, the defendant—did the defendant make any statement to you when his attorney was there?

*A.* I advised him of his Constitutional rights, on a certificate of notification form. He advised me that after conferring with his attorney, he wished to make no statement.

[14] He [Sergeant Bonner] also told us back in 1982, when the defendant was originally arrested, that the defendant never indicated to him that the shooting was an accident, but, in fact, indicated to him that he had nothing to say, no statement.

[15] The lead opinion, in contrast, places primary emphasis on what occurred *after* the prosecutor asked Sutton whether he had informed the police that the shooting was an accident.

that inquiry—not Sutton's testimony on direct examination[16]—that set in motion the chain of events that culminated in the repeated introduction of Sutton's failure to inform the police that the shooting was an accident and of his exercise of the right to remain silent.

A

When the prosecutor asked Sutton whether he had informed the police that the shooting was an accident, he was attempting to accomplish one of two purposes: 1) to elicit a prior statement that was inconsistent with Sutton's testimony on direct examination, or 2) to elicit Sutton's "silence" (i.e., his failure to tell the police that the shooting was an accident). It is manifest from the record in this case that the prosecutor was attempting to bring out Sutton's "silence."

Sutton responded to the prosecutor's inquiry on *cross*-examination that he had made a statement. Instead of searching for inconsistencies between Sutton's "statement" and his testimony on direct examination, the prosecutor "asked no more questions regarding this subject"[17] after Sutton testified that while "in police custody" in February, 1982, he told Bonner that the shooting was an accident. If the prosecutor's intention had been to impeach Sutton's direct testimony with a prior inconsistent

[16] We disagree with the suggestion that Sutton's testimony on direct examination or his earlier testimony on cross-examination "opened the door" for the prosecutor's inquiry on cross-examination. See *ante,* pp 580-581, 584-585, and 591, n 16. This aspect of the dissent is discussed more fully in part IV.

If we agreed with the lead opinion concerning whether Sutton had "opened the door" for the prosecutor's inquiry on cross-examination, we might find ourselves in substantial agreement with the lead opinion's analysis and result.

[17] *Ante,* p 585.

statement, he would have inquired further about the statement Sutton allegedly made to Bonner.[18]

## B

The prosecutor sought to bring out that Sutton had not stated that the shooting was an accident. The question remains whether it was permissible to do so.

The prosecution's evidence indicated that Sutton remained completely silent after he was arrested and given the *Miranda* warnings. The Due Process Clause as elucidated in *Doyle, supra,* barred the impeachment of Sutton's direct testimony with his postarrest, post-*Miranda* failure to inform the police that the shooting was an accident.[19]

Parenthetically, impeachment of Sutton's direct testimony with his prearrest or postarrest, pre-*Miranda* "silence" would not have been constitutionally impermissible. *Jenkins v Anderson,* 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980); *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982). The impeachment use of such evidence would, however, have been impermissible under the interpretation of *Bobo* that prevailed when Sutton was tried.

---

[18] The lead opinion appears to acknowledge that it was the prosecutor's intention to elicit Sutton's silence. See *ante,* p 590, n 15 ("The fact that the prosecutor did not go further is perhaps explained by the fact that he knew Sutton had not made a statement").

[19] In *Doyle,* the United States Supreme Court held that the Due Process Clause generally bars the impeachment use of a defendant's silence occurring after receipt of *Miranda* warnings.

The Court recognized an exception to the general rule against impeachment with post-*Miranda* silence where such evidence is used to contradict testimony about a defendant's postarrest behavior. *Id.,* p 619, n 11. This exception is not applicable in respect to the prosecutor's cross-examination because Sutton had not yet testified that he informed the police that the shooting was an accident. See part IV.

We are not referring to the applicability of the *Doyle* exception to Bonner's rebuttal testimony. Cf. *ante,* pp 594-595, n 19.

1

The record in the instant case indicates that the prosecutor failed to confine his initial inquiry on cross-examination to the constitutionally permissible pre-*Miranda* time frame. The prosecutor narrowed his inquiry no further than the month of February, 1982, which included both a pre-*Miranda* period (February 13-14)[20] and a post-*Miranda* period (February 14-28).[21] Where prosecutorial questioning has been found to refer to both pre- and post-*Miranda* silence, courts have found *Doyle* error.[22]

In *State v Lofquest*, 227 Neb 567, 570; 418 NW2d 595 (1988), the Supreme Court of Nebraska held that prosecutorial questioning and comment which "could be construed as referring to [Lofquest's] silence from the first police contact through the moment before Lofquest told his story at trial" violated the Due Process Clause where the record established that Lofquest had received the *Miranda* warnings at some point before his trial.[23] The court reasoned:

[20] The shooting occurred during the early morning hours of February 13, 1982. Sutton was arrested on February 14. Bonner testified that upon arrest Sutton was given the *Miranda* warnings.

[21] The record indicates that Sutton was in police custody from the time of his arrest until he posted bond, which apparently was on March 24, 1982.

[22] See *United States ex rel Allen v Franzen*, 659 F2d 745, 748 (CA 7, 1981), *State v Wells*, 229 Neb 89, 100; 425 NW2d 338 (1988), and *State v Lofquest*, 227 Neb 567, 570; 418 NW2d 595 (1988).

The lead opinion asserts that "*Lofquest* and *Franzen* are distinguishable" because "[u]nlike the instant case, in *Lofquest* and *Franzen* the defendant did *not* testify at trial that he gave a statement to the police that was consistent with his exculpatory story given at trial." *Ante*, p 596, n 22 (emphasis in original).

*Lofquest* and *Franzen* are cited only for the proposition that prosecutorial questioning that refers to both pre- and post-*Miranda* silence is impermissible. The validity of that proposition is not affected by the manner in which the defendant subsequently testifies.

[23] The lead opinion says that "the prosecutor's questions and state-

In a case such as this where a pre-*Miranda* and post-*Miranda* timeframe may exist, difficulties arise when general references are made to a defendant's silence, which a reasonable juror could construe as including the post-*Miranda* silence period. We cannot allow prosecutors to sidestep the *Doyle* protections by skirting the edge of the law with vague and imprecise references to a defendant's silence. [*Id.*]

We share those concerns. The United States Constitution provides that a defendant has the right not to be impeached with his post-*Miranda* silence. Prosecutors who intend to introduce evidence of a defendant's pretrial silence are obliged to clearly limit their questioning—with or without objection[24]—to the pre-*Miranda* period.[25]

ments [in *Lofquest*] were directed specifically to the postarrest time period." *Ante,* pp 594-595, n 19. The lead opinion fails to acknowledge that the postarrest and post-*Miranda* periods are not necessarily the same. In *Lofquest,* there was a dispute whether the defendant had received *Miranda* warnings when he was arrested or during earlier contacts with the police, but it was undisputed that he had received the warnings when he was arraigned (one day after his first police contact and the same day as his arrest). See *Lofquest,* p 568. Even if the prosecutor's inquiry and comments in *Lofquest* had been "directed specifically to the postarrest time period," they still would not have adequately distinguished between pre- and post-*Miranda* silence.

[24] The lead opinion says that "[a]n objection might have resulted in a direction from the trial court that the prosecutor's question was to be limited to the prearrest pre-*Miranda* warning period." *Ante,* p 591, n 16. With or without an exhortation from the trial court, a prosecutor is obliged—and certainly able—to limit his questioning to the constitutionally permissible time frame.

[25] The prosecutor's inquiry in this case clearly referred to a time frame that included both a pre- and post-*Miranda* period. See *United States ex rel Allen,* n 22 *supra,* p 748 ("the fact that the questions may have permissibly referred in part to the pre-arrest silence does not alter the conclusion that the references to post-arrest silence were unconstitutional").

There is thus no need to adopt a rule for the construction of prosecutorial questioning or comment that does not clearly refer to both pre- and post-*Miranda* silence. Cf. *ante,* p 594, n 19 ("Some courts hold that where postarrest post-*Miranda* silence is arguably in question, the burden is on the prosecutor to establish that there is a permissible line of inquiry").

2

Pursuant to the evidentiary framework adopted in *People v Collier*, 426 Mich 23; 393 NW2d 346 (1986),[26] Sutton's failure to inform the police that the shooting was an accident was inadmissible on the additional basis that such evidence did not have probative value to impeach Sutton's direct testimony that the shooting was an accident.

This is a case in which the defendant's "exculpatory" version of the events was incriminatory. Sutton's testimony indicated that at the time of the shooting he was carrying a concealed weapon without a permit. Informing the police of his "exculpatory" version would thus have meant confessing to the commission of a firearms violation[27] and to whatever offense might attach to an accidental killing.[28] Under the circumstances, it would not have been natural for Sutton to have come forward.[29] As a result, his failure to do so did not

[26] In *Collier*, the Court held that evidence of a defendant's failure to come forward and inform the police of the exculpatory version of events to which he testifies at trial is admissible for impeachment purposes where it would have been natural for the defendant not to have remained silent.

[27] Pursuant to MCL 750.227; MSA 28.424, carrying a concealed firearm without a permit is a felony punishable by a term of imprisonment of not more than five years or by a fine of not more than $2,500.

[28] See, e.g., MCL 752.861; MSA 28.436(21), which provides that the reckless or negligent handling of a firearm causing death or injury is a misdemeanor punishable by a term of imprisonment in the state prison for not more than two years, a fine of not more than $2,000, or a term of imprisonment in the county jail for not more than one year.

The jury in Sutton's trial was instructed on this offense.

[29] See *Commonwealth v Nickerson*, 386 Mass 54, 60-61; 434 NE2d 992 (1982), *State v Merola*, 214 NJ Super 108, 116-121; 518 A2d 518 (1986), *Silvernail v State*, 777 P2d 1169, 1178 (Alas App, 1989), and *People v McKinney*, 193 Ill App 3d 1012, —; 550 NE2d 604, 608 (1990), lv den 132 Ill 2d 551 (1990).

In *McKinney*, 550 NE2d 608, the Appellate Court of Illinois concluded that "[t]o adopt a rule that it is likely that everyone who acts accidentally or negligently will immediately acknowledge that action or negligence fails to meet the test of reason."

have probative value to impeach his testimony that the shooting was an accident, and such evidence was inadmissible for that purpose.

3

When the prosecutor asked Sutton whether he had informed the police in February, 1982, that the shooting was an accident, his manifest intention was to impeach Sutton's testimony that the shooting was an accident by showing that Sutton had not previously asserted this exculpatory version of the shooting.[30] However, Sutton's "silence," as defined by the prosecutor's inquiry, was not at the time admissible for that purpose under either the United States Constitution[31] or this state's evidence law.[32]

Sutton was thus asked a question to which either response would have led to the introduction of inadmissible evidence. He could have responded that he had not informed the police that the shooting was an accident, or—as occurred—Bonner could so testify to rebut Sutton's response that he had related the exculpatory version to the police.

C

Sutton might have prevented the introduction of *testimony* concerning his silence if his lawyer had objected to the prosecutor's initial question on cross-examination. It could thus be said that Sutton "waived" his right not to be impeached with post-*Miranda* silence when his lawyer failed to object to the prosecutor's question.

Under the circumstances of this case, we decline

---

[30] See part II(A).

[31] See part II(B)(1).

[32] See part II(B)(2).

to so construe the failure of Sutton's lawyer to object. There was a significant probability that an objection would have conveyed to the jury that Sutton had not told the police that the shooting was an accident. The failure to take an action that would itself have undermined the right not to be impeached with post-*Miranda* silence cannot fairly be deemed a waiver of the right not to be impeached with post-*Miranda* silence.

If Sutton's lawyer had objected and the objection had been sustained, the jury probably would have speculated whether Sutton had informed the police that the shooting was an accident. If the jury had so speculated, it likely would have assumed that Sutton had not informed the police that the shooting was an accident.

There were in essence only two answers to the prosecutor's question. Either Sutton told the police that the shooting was an accident, or he did not. The jury likely would have assumed that if Sutton had told the police that the shooting was an accident, he would have so testified on direct examination[33] or he would have sought to so testify on cross-examination.

If Sutton's lawyer had objected and the objection had been sustained, it is thus likely the jury would have disregarded one of the two possible answers to the prosecutor's question. The other answer—that Sutton had not informed the police that the shooting was an accident—is, of course, something the prosecutor could not permissibly have proved during cross-examination of Sutton.[34] In the in-

[33] The jury would not have known that Sutton could not have testified on direct examination that he had so informed the police. Sutton's alleged statement would have been inadmissible hearsay if offered on direct examination.

[34] Thus, Sutton's lawyer was also faced with a "conundrum." Cf. *ante*, p 589 (discussing the "conundrum" faced by the prosecutor

stant case, the harm was in the asking.

Analogous is *People v Ignofo,* 315 Mich 626; 24
NW2d 514 (1946). There, the prosecutor cross-
examined Ignofo about a conversation with his ex-
wife in which they allegedly discussed Ignofo's
involvement in a murder. Ignofo's lawyer did not
object. Because of the statutory privilege pertain-
ing to confidential marital communications,[35] Igno-
fo's ex-wife could not have testified about any
statements she had made. In answering the prose-
cutor's questions, Ignofo did not disclose any privi-
leged marital communications, but instead denied
that his former wife had made any statements
regarding his involvement in the murder.[36]

Relying on *People v Salisbury,* 218 Mich 529;
188 NW 340 (1922),[37] the Court found prejudicial
error in the cross-examination and said that "[t]he

---

when Sutton testified on cross-examination that he told Bonner that
the shooting was an accident). It was the prosecutor, however, who
created both conundrums by asking Sutton an impermissible question
on cross-examination.

[35] 1929 CL 14221; MSA 27.916, as amended by 1939 PA 82. Cur-
rently, MCL 600.2162; MSA 27A.2162.

[36] Thus, in both *Ignofo* and the instant case, the defendant's testi-
mony on cross-examination did not introduce inadmissible evidence.
In *Ignofo* it was a negative answer which did not reveal inadmissible
evidence whereas in *Sutton* it was an affirmative answer.

[37] In *Salisbury,* the prosecutor cross-examined the defendant con-
cerning admissions he allegedly made to his wife. There was no
objection. Salisbury denied having made the admissions. The Court
found error requiring reversal. The Court made these pertinent
observations:

> The effect of permitting such a course to be pursued cannot
> but be apparent to any person familiar with the trials of
> criminal cases. Propounding the question, even if answered in
> the negative, cannot but leave an impression on the minds of at
> least some of the jury that the wife, if permitted, would testify
> that the statement was made to her. The statute prohibits such
> disclosures on the part of the wife and in our opinion must be
> held to equally prohibit questioning the husband concerning
> them. [*Id.,* p 536 (quoted in *Ignofo,* pp 639-640).]

failure of counsel to object to this line of question-
ing did not nullify the error."[38]

As in *Ignofo,* the prosecutor in the instant case
could not have introduced the challenged evidence
in the case in chief.[39] In both *Ignofo* and the
instant case, the prosecutor sought on cross-exami-
nation of the defendant to put before the jury
otherwise inadmissible evidence. We see no reason
to distinguish between creating an impression
through questioning (*Ignofo*), and creating an im-
pression by causing an objection or questioning to
establish a predicate for the subsequent introduc-
tion of rebuttal testimony (*Sutton*).

### D

On cross-examination and recross-examination
of Bonner, Sutton's lawyer implied that Bonner
was lying, and in closing argument the lawyer
again stated that Sutton had informed the police
that the shooting was an accident. It could thus be
said that Sutton waived his right not to be im-
peached with post-*Miranda* silence on the theory
that Sutton's lawyer placed in issue his postarrest
conduct when he adopted the position that Sutton
had informed Bonner that the shooting was an
accident.

Under the circumstances of this case, the posi-
tion taken by Sutton's lawyer cannot fairly be
deemed a waiver of Sutton's right not to be im-
peached with post-*Miranda* silence. The assertions
of Sutton's lawyer that Bonner was lying came
after Bonner asserted that Sutton was lying. A
defense lawyer is not expected to allow testimony
that directly contradicts the testimony of his client

[38] *Ignofo,* p 641.

[39] It seems beyond dispute that a defendant's post-*Miranda* silence
may not be used as substantive evidence of guilt.

to go unchallenged. Enforcement of a defendant's right not to be impeached with post-*Miranda* silence cannot properly be conditioned on surrender at trial.

It may seem that our ruling allows a defendant to have his cake and eat it too. In the instant case, however, it was the prosecutor, and not the defendant, who baked the cake.[40]

### III

The reference to Sutton's silence was not an isolated occurrence. Not only did Bonner testify regarding Sutton's failure to disclose the exculpatory version, he also testified regarding Sutton's post-*Miranda* exercise of the right to remain silent. The prosecutor referred to this testimony in closing argument.

The prosecutor asked an impermissible question during his cross-examination of Sutton. The result was a side show, a minitrial concerning a subject that should not have been broached and should not have been permitted to go further.

We agree with the Court of Appeals that Sutton did not receive a fair trial. Sutton's trial was a close credibility contest in which Sutton denied shooting the decedent, and one witness alone, among many present at the incident, testified that he saw Sutton shoot the decedent.

### IV

The lead opinion places emphasis on several

---

[40] See, generally, *United States v Elkins*, 774 F2d 530, 539, n 8 (CA 1, 1985) (defense counsel referred to the defendants' post-*Miranda* silence during cross-examination of a government witness and in his closing argument; the court said that "[t]he 'invited error' defense is not open to the government, because the prosecutor made the initial reference to the defendants' silence"). See also *United States v Meneses-Davila*, 580 F2d 888, 895-896 (CA 5, 1978).

decisions sustaining the use of a defendant's post-*Miranda* silence to impeach trial testimony regarding his postarrest conduct. This exception to the general rule against impeachment with post-*Miranda* silence was recognized by the United States Supreme Court in *Doyle*.[41] If Sutton had testified on *direct* examination that he had informed the police that the shooting was an accident, this exception would indeed be applicable to the prosecutor's initial inquiry on cross-examination of Sutton. On the facts of this case, however, the authorities cited by the lead opinion are inapplicable *to the prosecutor's initial inquiry on cross-examination.*[42]

In *United States v Mavrick*, 601 F2d 921 (CA 7, 1979), the defendant testified on direct examination that when he was arrested he was not given an opportunity to offer his exculpatory version of events to the police. In light of the impression created by Mavrick's testimony, the court concluded that it was permissible for the prosecutor to ask Mavrick whether he had been given an opportunity to explain his conduct to the FBI agents who took him into custody shortly after he was arrested.[43] In the instant case, Sutton's testimony on

---

[41] See *Doyle, supra,* p 619, n 11. See also *People v Graham,* 386 Mich 452; 192 NW2d 255 (1971).

[42] Again, we are not referring to the applicability of the *Doyle* exception to Bonner's rebuttal testimony. Cf. *ante,* p 594, n 19.

[43] The prosecutor's cross-examination "was not clearly directed at eliciting an admission of the defendant's post-arrest silence," but instead was directed to "whether the defendant was given an opportunity to explain at any time after his arrest." *Id.,* p 933.

Unlike *Mavrick,* in the instant case, the prosecutor's examination on surrebuttal was manifestly designed to elicit testimony that Sutton had remained silent when he was arrested. See n 13. Thus, even if Sutton had "opened the door" to the same extent as Mavrick, the opinion of the United States Court of Appeals for the Seventh Circuit would not necessarily support the lead opinion's position.

Also, in *Mavrick,* "[t]he prosecution did not pursue the matter any further and it did not argue it to the jury during closing argument."

direct examination did not create the impression that when he was arrested he had been denied an opportunity to tell the police that the shooting was an accident.[44]

In *United States v Fairchild,* 505 F2d 1378 (CA 5, 1975), the prosecutor elicited testimony from a police officer that after receiving the *Miranda* warnings, the defendant had refused to make a statement. However, unlike *Sutton,* the defendant's lawyer in *Fairchild* created the impression through cross-examination of a different government witness that his client had coöperated fully with the authorities.[45] The United States Court of Appeals for the Fifth Circuit held that the prosecutor's inquiry was permissible to rebut the impression that Fairchild had coöperated with the authorities. In the instant case, Sutton's lawyer did not create a similar impression through his

---

*Id.,* p 932. In contrast, the prosecutor in the instant case twice elicited testimony from Bonner regarding Sutton's silence and then mentioned Sutton's silence in closing argument.

[44] In *Mavrick,* the basis for the inference that was permitted to be countered with evidence of the defendant's postarrest "silence" was the following direct testimony of the defendant:

"*Q.* Did you attempt at the time of your arrest to explain your conduct to those officers who were taking you into custody?
"*A.* Yes, we did.
"*Q.* Did they give you an opportunity at that time to speak?
"*A.* No, they told us to shut up, and they don't want to hear it." [*Id.,* p 932.]

The trial transcript—before the prosecutor's initial inquiry on cross-examination of Sutton—contains nothing remotely similar to the defendant's testimony in *Mavrick. Summit v Blackburn,* 795 F2d 1237 (CA 5, 1986), is distinguishable for the same reason.

[45] Defense counsel created this impression when he asked the witness, " 'During the period of time that this investigation has been going on, to your knowledge has Mr. Fairchild cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted?' " *Id.,* p 1383.

cross-examination of Bonner during the prosecution's case in chief.[46]

In *United States v Conlin*, 551 F2d 534, 537 (CA 2, 1977), the defendant's lawyer "propounded the theory that Conlin had spoken throughout the incident and had maintained from the outset that he had [an innocent explanation for his apparently unlawful conduct]." This theory was advanced during cross-examination of a government witness and through Conlin's own testimony. In the instant case, neither Sutton on direct examination nor his lawyer on cross-examination of Bonner during the prosecution's case in chief advanced the theory that Sutton had continuously asserted his innocence, at the time of the shooting or thereafter.

There is no basis on which it can be said that Sutton's testimony on direct examination created an inference—"arguable" or otherwise—that legitimately could be rebutted by testimony about his post-*Miranda* silence. There is no basis in fact for the lead opinion's suggestion that the prosecutor's initial inquiry on cross-examination might have been permissible to test "the credibility of defendant's testimony on direct examination implying that he would have made an explanation consis-

---

[46] *United States v Dixon*, 593 F2d 626 (CA 5, 1979), is not on point for a similar reason. There, Dixon's direct testimony, that on four or five occasions he had spoken with an FBI agent, "arguably created the inference that he had been cooperating with the police." *Id.,* p 630. The FBI agent's testimony that Dixon had never related to him the exculpatory version of events he was offering at trial was permissible to rebut that inference.

In the instant case, Sutton did not testify on direct examination that he had spoken with the police. There is no basis for finding an "arguable inference" of coöperation which could then be rebutted with Sutton's postarrest silence.

It also should be noted that *Dixon* did not hold that the rebuttal testimony was not a *Doyle* violation. Rather, the court assumed a *Doyle* violation and held that under the circumstances any error was harmless. *Id.,* pp 628-630.

tent with his trial testimony but for the police conduct in 'grabbing him' . . . ."[47]

It is difficult to imagine a more routine description of an arrest than Sutton's testimony that the police grabbed him and informed him that he was being charged with first-degree murder. A defendant who testifies that he was arrested and informed of the charge does not thereby waive his constitutional right elucidated in *Doyle* not to be impeached with post-*Miranda* silence.[48]

Cavanagh and Archer, JJ., concurred with Levin, J.

---

[47] *Ante,* pp 580-581. See also *ante,* p 584.

[48] With respect to the testimony elicited by Sutton's lawyer that Sutton voluntarily surrendered to the police in February, 1982, and that he voluntarily returned to Michigan in August, 1983, it is clear that this testimony was designed to rebut the adverse inference arising from Bonner's testimony on direct examination in the prosecution's case in chief that Sutton had not appeared for his June, 1982, trial and that he was subsequently arrested in Ohio.