PEOPLE v. IGNOFO.

1. WITNESSES—PRIVILEGED COMMUNICATIONS—HUSBAND AND WIFE.
    The exclusion of confidential communications between persons occupying the intimate relation of husband and wife is predicated on the necessity of fostering such relation and the greater injury likely to result from permitting disclosure than the benefit gained thereby, confidence and secrecy being presumed to have been intended, and the statute absolutely prohibits their divulgence by either of the parties as witnesses "without the consent of both" (3 Comp. Laws 1929, § 14221, as amended by Act No. 82, Pub. Acts 1939).

2. SAME—CROSS EXAMINATION—CONFIDENTIAL COMMUNICATIONS—HUSBAND AND WIFE.
    Under statute prohibiting a husband or wife from testifying as against the other without the consent of both, defendant could not be cross-examined as to confidential communications made by him to his wife relative to the charge against him (3 Comp. Laws 1929, § 14221, as amended by Act No. 82, Pub. Acts 1939).

3. CRIMINAL LAW—CROSS EXAMINATION—PRIVILEGED COMMUNICATION—FAILURE TO OBJECT.
    The asking of questions on cross examination of defendant, charged with murder of the first degree, relative to communication made to his wife from whom he had since secured a divorce, which had the effect of placing in the minds of jurors some idea that she knew defendant was in some way connected with the murder constituted prejudicial error notwithstanding defendant answered all questions in the negative and the failure of defendant's counsel to object to such line of questioning did not nullify the error (3 Comp. Laws 1929, § 14221, as amended by Act No. 82, Pub. Acts 1939; § 17354; Act No. 328, § 316, Pub. Acts 1931).

Appeal from Berrien; Evans (Fremont), J. Submitted June 13, 1946. (Docket No. 53, Calendar No. 43,171.) Decided October 7, 1946.

Joseph Ignofo, alias Joe Neuff, was convicted of murder of the first degree. Reversed and new trial granted.

*Thomas N. Robinson,* for appellant.

*John R. Dethmers,* Attorney General, *Karl F. Zick,* Prosecuting Attorney and *Arthur E. Leckner,* Assistant Prosecuting Attorney, for the people.

Sharpe, J. Defendant, Joseph Ignofo, was charged, tried and convicted of murder in the first degree.*

The following facts are well established by the record. In the early morning of February 6, 1935, the partially clothed and frozen body of one Augustina Gagliana was found in an alley in the city of Benton Harbor. The head of the body was bruised and the throat had been cut. There was no blood on the body except a small quantity on the clothing. The head bruises were on the left side of the scalp. Deceased resided in the country, a few miles from Benton Harbor. The widow and young son of deceased left on February 2, 1935, for a visit in Chicago leaving Mr. Gagliana alone on the farm. On their return Sunday evening, February 3, 1935, with other members of the family, they found that he was not at home. There was no sign of any struggle in the home.

The law enforcement agencies made an investiga-

---

* See Act No. 328, § 316, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 17115-316, Stat. Ann. § 28.548).—Reporter.

tion of the crime and questioned one Sam Tomasello and defendant, Joseph Ignofo, also known as Joseph Neuff. Sam Tomasello was a brother of one Joe Tomasello who was a son-in-law of deceased. Sam Tomasello had made his home with the Gagliana family for several years, aiding in the farm work, but about two weeks before the murder he had obtained employment in a factory in St. Joseph, Michigan. Joseph Ignofo was a nephew of the deceased's wife. He was 23 years of age and had been employed at the factory where Sam Tomasello had obtained employment. He also had lived at the Gagliana farm. A short time before the death of Mr. Gagliana, Joseph Ignofo and Sam Tomasello had taken a room together in St. Joseph. The factory records show that defendant worked eight hours on Friday, February 1, 1935, and all intervening days through February 8, 1935, except Sunday, February 3d, and Thursday, February 7th, the day of Mr. Gagliana's funeral.

On or about December 13, 1940, Sam Tomasello, having been arrested in Chicago, was brought to Michigan and charged with the murder of Augustina Gagliana. He implicated defendant with the murder.

The cause came on for trial. The prosecuting attorney produced Sam Tomasello as a witness who testified that when Mrs. Gagliana left for Chicago on Saturday morning February 2, 1935, defendant with Sam Tomasello, both of whom had slept at the Gagliana home the previous night, went to Benton Harbor to take her to the bus; that near midnight of the same day defendant suggested to Sam that they go out to the Gagliana home to be there early the next morning to cut wood; that upon entering the Gagliana home they found Mr. Gagliana asleep on a day-bed in the dining room; that

the house was cold and Sam went into the yard to get some wood and on his return about 15 minutes later he saw deceased partly or entirely off the day-bed and defendant pounding his head with a four- or five-pound hammer and accusing deceased of having raped defendant's sister; that defendant came into the kitchen, washed the hammer and took a basin of water into the dining room; that defendant insisted that Sam should aid defendant in removing the body because they were both involved; that the body was hidden under some floor boards in the chicken coop; that on the way back to Benton Harbor, defendant threw the hammer into a creek near the Gagliana home; that they both stayed at a hotel in Benton Harbor; and that he did not know how or when the body was removed from the chicken coop.

Defendant testified and denied the material parts of the story told by Sam Tomasello. The jury returned a verdict of guilty of the crime of first degree murder. Defendant filed a motion for a new trial upon the grounds that the verdict of the jury was contrary to the great weight of the evidence; that the misconduct of the prosecuting attorney in his argument to the jury resulted in a miscarriage of justice; that the court erred in instructing the jury substantially as follows:

"It is immaterial whether this killing occurred February 3, 1935, or February 4, 1935. * * *

"You are instructed that you must also closely scrutinize the testimony of the defendant in like manner as that of the confessed accomplice."

That the court erred in permitting the prosecuting attorney to exhibit to the jury three pictures of the body of deceased as it lay in its casket taken in January, 1941, when the grave was opened; and that the prosecuting attorney in his concluding

argument to the jury stated among other things, as follows:

"Joe Neuff killed that man. He has been slick enough and smooth enough to get away with it a number of years. Oh, yes, but there is the record and it has caught up with him."

On March 16, 1945, defendant filed a supplemental motion for a new trial in which it is claimed that the court was in error in permitting the prosecuting attorney to cross examine defendant on confidential communications between himself and his former wife relative to the charge against him. The court denied the motions for a new trial.

Defendant appeals. It is alleged that the trial court was in error in instructing the jury that it was immaterial whether the killing occurred February 3, 1935, or February 4, 1935.

Section 17265, 3 Comp. Laws 1929 (Stat. Ann. § 28.991), reads as follows:

"Except insofar as time is an element of the offense charged, any allegation of the time of the commission of the offense, whether stated absolutely or under a videlicet, shall be sufficient to sustain proof of the charge at any time before or after the date or dates alleged, prior to the finding of the indictment or the filing of the complaint and within the period of limitations provided by law; *Provided,* That the court may on motion require the prosecution to state the time or identify the occasion as nearly as the circumstances will permit, to enable the accused to meet the charge."

In the case at bar the information alleges that the offense was committed on, to wit, the 4th day of February, 1935. Time is not the essence of this offense. The objection is without merit. See *People v. Robinson,* 228 Mich. 64.

It is also urged that the verdict of the jury was contrary to the great weight of the evidence. The evidence given by the accomplice, Sam Tomasello, if believed, was sufficient to justify a verdict of guilty.

In *People* v. *Zesk,* 309 Mich. 129, we quoted with approval from 1 Gillespie on Michigan Criminal Law & Procedure, § 379:

" 'The credibility of an accomplice, like that of any other witness, is exclusively a question for the jury, and it is well settled that a jury may convict on such testimony alone.' "

The testimony of the accomplice was positive and based upon what he said he saw and heard. It was corroborated to the extent that the doctor who examined the body on February 6, 1935, testified that there were severe bruises on the head which had the appearance of having been made by blows dealt from some blunt heavy instrument; and when the body was exhumed and the head examined, a hole in the skull was found corresponding in size to an indenture made by the blunt end of a hammer. It is our opinion that there was competent evidence from which a jury could find defendant guilty of the crime beyond a reasonable doubt.

It is also urged that the prosecuting attorney in his argument to the jury used vicious, intemperate, improper, abusive and inflammatory language which prejudiced the jury against defendant. Space will not permit us to quote the language used. The language used was bellicose. It certainly was not anemic. We note that during the argument to the jury the prosecuting attorney stated as follows:

"Joe Neuff killed that man. He has been slick enough and smooth enough to get away with it a number of years. Oh, yes, but there is the record and it has caught up with him."

In *People* v. *Quick,* 58 Mich. 321, defendant was convicted of stealing a watch. In his argument to the jury, the prosecuting attorney made the following statement in reference to certain witnesses:

"I stand here to-day under the solemnity of my official oath, and say to you, as a man and a citizen, that I believe they not only lied, but I believe they committed willful and deliberate perjury. I do not believe that they were there that night, nor do I believe that that man, the defendant, ever in God's world took that watch from the sidewalk, but he stole it from the person of David Wright, and then hid it away within five minutes."

Objections were made to this statement and again it was complained of in a specific request to charge which was refused. We there said:

"This language came from an officer whose sworn duty required him to act only in furtherance of justice, and who is bound by statutory requirements to stand entirely impartial between the complainant and the prisoner. When such an officer gives the jury to understand that what he says is under the sanction of his official oath, and the court, when applied to, declines to correct that statement, it cannot be supposed that jurors may not give credence to it and govern their decision more or less by it. The impropriety of expressing a personal opinion to the jury upon disputed facts has always been regarded as great, and has in some notable instances led to unpleasant strictures on the character of celebrated counsel. Whatever allowance may be made for professional enthusiasm, a deliberate and solemn averment of counsel's opinion should never be allowed to influence the jury, and when given as here, as an opinion under oath, it should have been at once shut out and its influence guarded against by proper instructions as requested."

In *People* v. *Williams,* 159 Mich. 518, we said:

"The rule has been repeatedly stated that, if the prosecutor desires to get facts before the jury of which he has knowledge, they should be presented by him as a witness, and not by way of argument."

In *People* v. *Dane,* 59 Mich. 550, the prosecutor in his address to the jury asserted "that he knew that the defendant was the man who took the money." Objection was taken to the remark at the time, but the presiding judge failed to instruct the jury regarding the same. We there said:

"It is the duty of the public prosecutor to see that the person charged with crime receives a fair trial, so far as it is in his power to afford him one, and it is likewise his duty to use his best endeavor to convict persons guilty of crime; and in the discharge of this duty an active zeal is commendable, yet his methods to procure conviction must be such as accord with the fair and impartial administration of justice; and it is improper for one occupying the position of the prosecuting officer to make a statement to the jury of a fact, as of his own knowledge, which has not been introduced in evidence under the sanction of an oath, relating to the material issues in the case: *State* v. *Balch,* 31 Kan. 465 (2 Pac. 609). If the prosecutor was cognizant of the fact that the defendant was the man who took the money, and wished the jury to be possessed of his knowledge, he should have been sworn as a witness, and given his evidence in the usual way, so that the defendant could have the benefit of a cross-examination. Nor can we say that the statement made by the prosecutor was error without prejudice. It is impossible to tell what influence the statements had upon the mind of the jury. It is presumable that statements of fact based upon personal knowledge, made by a person occupying the responsible position of prosecuting attorney of a county, whom the people have chosen because of his ability and character to fill that position, would have both

weight and influence with the jury, and may have determined any doubt which they, or some of them, may have entertained of the defendant's guilt against him.''

See, also, *People* v. *Bigge,* 288 Mich. 417.

In *Clark* v. *Ulrich,* 153 Mich. 695, 719, a civil case, we said:

''If counsel possesses any information in relation to the facts which he thinks should get to the jury, he should be sworn as a witness and subject himself to the rules governing the taking of testimony.''

In *People* v. *Holmes,* 292 Mich. 212, defendant was convicted of the crime of rape. During the cross-examination of defendant, the following question was asked of him: ''Have you ever had intercourse like that before?'' Defendant replied: ''Yes, I have.'' No objection was made to the question asked or the answer given, nor was the trial court requested to instruct the jury thereto. In reversing, a divided court said:

''It is axiomatic that an objection not properly and timely presented to the court below will be ignored on review and, except under unusual circumstances, we have no disposition to relax this rule. Nevertheless, in the exercise of supervisory control over all litigation, appellate courts have long asserted the right to consider manifest and serious errors although objection was not made by the party who appeals. As stated in *Gonzales* v. *Rivera,* 37 N. M. 562, 569 (25 Pac. [2d] 802):

'' 'Ordinarily this court is content to examine the points here relied upon for reversal, if properly preserved at the trial, sustaining or overruling them. That is all appellants are entitled to as of right. But that does not limit the inherent power of this court to prevent fundamental injustice.'

"See *People* v. *Dean*, 308 Ill. 74 (139 N. E. 37);
*People* v. *Leonardi*, 143 N. Y. 360 (38 N. E. 372);
*People* v. *Conti*, 215 App. Div. 270 (213 N. Y. Supp.
449); *Ellerd* v. *Murray* (Tex. Civ. App.), 247 S. W.
631; and the cases collected in note 98 of 4 C. J. S.
p. 497. In the exercise of this power we have our-
selves reversed a case where inadmissible evidence
was admitted without objection. *People* v. *Steeneck*,
247 Mich. 583."

In *People* v. *Kelsey*, 303 Mich. 715, defendant was
convicted of manslaughter resulting from abortion.
Defendant testified in his own behalf, and on cross-
examination, the prosecutor interrogated him rela-
tive to four other women by a series of questions
which insinuated that he had performed abortions
on these parties. In each instance the woman was
brought into the court room and defendant was
asked if he had not performed a criminal operation
upon her. No objection was made to this form of
cross-examination. We there said:

"Appellee contends, however, that complaint of
the cross-examination cannot be made now because
no objection was interposed thereto in the trial
court. Ordinarily this is true, yet, as here, where
serious error has been committed, this court should
take cognizance of such error under our supervisory
powers although no objection was made in the trial
court."

In the case of *People* v. *Quick, supra,* the prose-
cuting attorney was voicing his opinion as to the
credibility of certain witnesses. In the case of
*People* v. *Holmes, supra,* defendant, on cross-
examination, was asked if he had intercourse like
that before. No objection was made by defendant's
counsel to the question asked or the answer given.
In *People* v. *Kelsey, supra,* defendant was asked,

upon cross-examination, questions which insinuated that he had performed other abortions. No objections were offered by defendant's counsel, yet in the *Holmes* and *Kelsey Cases* we held such conduct upon the part of the prosecuting attorney reversible error.

In the case at bar the statement of the prosecuting attorney was not an expression of his opinion. It was a statement of fact that should only have been made by a witness. While no objection was made to such statement at the time it was made or specific charge requested of the court, yet in our opinion such statement could not be eradicated from the minds of the jury and is reversible error.

It is also urged that it was error to permit the prosecuting attorney to cross-examine defendant regarding confidential communications with his former wife relative to the charge against defendant. The questions asked and the answers given read as follows:

"*Q.* Where was your wife when you got the divorce?

"*A.* I don't know.

"*Q.* You were living in Chicago part of that time?

"*A.* While married, yes, sir.

"*Q.* Living prior to that time at 1025 Larrabie street?

"*A.* Yes.

"*Q.* While living at 1025 Larrabie Street you and your wife had an argument, didn't you?

"*A.* A family quarrel.

"*Q.* And you were in the process of beating your wife?

"*A.* No.

"*Q.* Hitting her?

"*A.* Not always.

"*Q.* You did?

"*A.* She hit me back and I hit her back.

"*Q.* Something came up about this murder?

"*A.* Not that I know.

"*Q.* Between you and your wife?

"*A.* No, sir.

"*Q.* At that time?

"*A.* No, sir.

"*Q.* And she told you she knew who did it, didn't she?

"*A.* I don't remember.

"*Q.* Didn't she, Mr. Neuff?

"*A.* I don't remember.

"*Q.* If she did, you would remember, wouldn't you?

"*The Court:* I don't think—that is—I think that question is objectionable.

"*Mr. Small:* Very well.    *    *    *

"*Q.* The time when you struck her and when she left you was when you and your wife were talking about this particular thing right here?

"*A.* No, sir.

"*Q.* You remember the time when you and your first wife were talking about this, don't you?

"*A.* No.

"*Q.* You remember the time you had trouble with your wife at 1025 Larrabie?

"*A.* Yes, sir.

"*Q.* And you don't remember what went on?

"*A.* No, sir.    *    *    *

"*Q.* As a matter of fact, Mr. Neuff, Ila Brant after she married you found out that you had a part in this murder, didn't she?

"*A.* No.

"*Q.* And she told you about it, didn't she?

"*A.* No.

"*Q.* And from then on you would have nothing to do with her, isn't that true?

"*A.* No.

"*Q.* And from then on you started taking your vengeance out on her?

"*A.* No.

"*Q.* And from then on you started to have fights with her?

"*A.* No, sir.

"*Q.* And from then on you never would allow her around you, isn't that true?

"*A.* No.

"*Q.* And she wasn't any place around when you got this divorce, was she?

"*A.* No.

"*Q.* And you don't know where she is now?

"*A.* No.

"*Q.* As a matter of fact you have kept very close track of her whereabouts, haven't you, Mr. Neuff?

"*A.* No, sir."

Section 14221, 3 Comp. Laws 1929, as amended by Act No. 82, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 14221, Stat. Ann. 1945 Cum. Supp. § 27.916), provides in part as follows:

"Nor shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other during the marriage."

In *People v. Salisbury,* 218 Mich. 529, defendant was called as a witness in his own behalf. He was cross examined, without objection, as to statements in the nature of admissions of the crime with which he was charged claimed to have been made by him to his wife. All of which statements he denied. In reversing the case and granting a new trial, we said:

"The exclusion of such communications when made in confidence between persons occupying the intimate relation of husband and wife is predicated on the necessity of fostering such relation and the greater injury likely to result from permitting their disclosure than the benefit to be gained thereby.

Confidence and secrecy are presumed to have been intended in such marital communications and the statute absolutely prohibits their divulgence by either of the parties as witnesses 'without the consent of both.'

"The course pursued by the prosecuting attorney to which objection was made brought clearly before the jury the fact that defendant's wife had made a statement in writing to him, in which she had said that defendant made the admissions which he as a witness denied. Counsel could not and did not seek to call the wife as a witness. In this indirect way he placed before the jury the fact, unsworn to, that such damaging admissions had been made by the defendant to her. That prejudice resulted therefrom cannot be doubted.     *     *     *

"It is well settled in this State that when a defendant in a criminal case becomes a witness in his own behalf he may be cross-examined in the same manner as any other witness in the case. *People* v. *Sutherland,* 104 Mich. 468. At first blush, it might seem, as it did to the trial court, that under such rule defendant might be asked as to admissions made by him to his wife just the same as though the claimed admissions were made to another person. But cross-examination is restricted as to other witnesses when the answers would reveal confidential communications, the divulgence of which is prohibited by statute.     *     *     *

"There is no question but that the wife of defendant could not be asked to disclose such communications. May he on cross-examination be required to do so? The statute says that neither the husband nor wife shall be examined as to them *without the consent of both.* As the wife is not a competent witness, and not a party, her consent cannot be secured. Aside from this, however, we do not think that defendant could be interrogated as to statements made by him to his wife where her lips as to them are sealed by the statute. The effect of per-

mitting such a course to be pursued cannot but be apparent to any person familiar with the trials of criminal cases. Propounding the question, even if answered in the negative, cannot but leave an impression on the minds of at least some of the jury that the wife, if permitted would testify that the statement was made to her. The statute prohibits such disclosures on the part of the wife and in our opinion must be held to equally prohibit questioning the husband concerning them."

See, also, *People* v. *Gessinger,* 238 Mich. 625, and *People* v. *Zabijak,* 285 Mich. 164.

In the case at bar the prosecuting attorney did not and could not call defendant's divorced wife as a witness. The people urge that all questions asked defendant were answered in the negative and if error was committed, it was a minor error and covered by 3 Comp. Laws 1929, § 17354 (Stat. Ann. § 28.1096).

In *People* v. *Bigge,* 297 Mich. 58, we had occasion to construe the above statute which provides that no judgment or verdict shall be set aside unless it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. We there said:

"The statutory provision may mollify minor errors which clearly can be held not to affect the result, but it is not a cure-all and it must serve within constitutional limitations. It cannot cure an error which deprives an accused of the right of due process of law."

The questions asked defendant related to the crime with which he was charged. The effect of asking these questions was to place in the minds of the jurors some idea that defendant's divorced wife knew that defendant was in some way con-

nected with the murder. Defendant's divorced wife could not testify and give answers to the questions asked and in our opinion it was prejudicial error on the part of the prosecuting attorney to have asked such questions. The failure of counsel to object to this line of questioning did not nullify the error. See *People* v. *Kelsey,* 303 Mich. 715.

It is also claimed to be prejudicial error for the court to sustain the objection to the question put to defendant by his counsel relative to the "lie detector" test undergone by defendant. There was no error on the part of the trial court in sustaining the objection. See *People* v. *Becker,* 300 Mich. 562 (139 A. L. R. 1171).

Error is also asserted by defendant because of the admission in evidence of certain photographs of the body of deceased as has been hereinbefore noted. In *People* v. *Becker, supra,* certain pictures and bloody garments were introduced in evidence over the objection of defendant. We there said: "The general rule upon the admissibility of this kind of evidence is that it is admissible if helpful in throwing light upon any material point in issue." In the case at bar the pictures would offer some evidence as to what might have caused Mr. Gagliana's death. It was not error to admit the pictures in evidence.

We have considered other questions relied upon by defendant relating to the conduct of the prosecuting attorney in presenting a former under sheriff and a former prosecuting attorney as witnesses; and his statement to the jury concerning the qualifications of Dr. Snyder. There was impropriety in such conduct, however, these claimed errors should not occur on a retrial of the case.

For the reasons stated in this opinion, the judgment of conviction must be set aside and a new trial granted.

REID, J., concurred with SHARPE, J. BUTZEL, C. J., and BUSHNELL, J., concurred in the result.

NORTH, J. (*concurring*). I concur in reversal on the ground that the cross-examination of defendant relative to confidential communications with his former wife constituted prejudicial error. But I do not agree that "reversible error" resulted from the remarks quoted by Mr. Justice SHARPE from the argument of the prosecuting attorney, to which no objection was made at the trial nor was any request made for a pertinent charge to the jury. I am not willing to hold that under the circumstances "such statement could not be eradicated from the minds of the jury." Instead, a ruling as to whether there was reversible error must depend upon all the attending circumstances of the particular case. Under some circumstances the prejudicial effect may be eliminated by proper procedure. See *People* v. *Rosa,* 268 Mich. 462; *People* v. *Cleveland,* 295 Mich. 139; *People* v. *Zesk,* 309 Mich. 129. On the other hand, there may be attendant circumstances disclosed by the record in a given case which would necessitate reversal. *People* v. *Bigge,* 288 Mich. 417. Since in the instant case no objection was timely made nor was there any request for an appropriate charge to the jury, the quoted remarks alone did not constitute reversible error.

CARR, and BOYLES, JJ., concurred with NORTH, J. STARR, J., took no part in the decision of this case.