# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

PIERREZ RICARDO LASSETTI IV,

      Defendant-Appellant.

UNPUBLISHED
November 21, 2017

No. 332680
Oakland Circuit Court
LC No. 2015-254186-FC

---

Before: BECKERING, P.J., and O BRIEN and CAMERON, JJ.

PER CURIAM.

A jury convicted defendant, Pierrez Ricardo Lassetti, IV, of three counts of armed robbery, MCL 750.529, and one count of bank robbery, MCL 750.531. The trial court sentenced him as a fourth habitual offender, MCL 769.13, to prison terms of 20 to 40 years for each conviction, to be served concurrently. Defendant appeals his convictions as of right. We affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

At approximately 10:45 a.m. on March 11, 2015, a lone masked man dressed in black, wearing dark gloves, and waiving and pointing what some witnesses thought was a gun covered in a black cloth entered the Comerica Bank located in Southfield, Michigan, at Ten Mile Road and Telegraph Road. It is undisputed that no one saw an actual weapon and that the robber did not verbally threaten that he had a gun. One after the other, the robber approached the window of three tellers and demanded that each give the robber her money. Along with the money in their tills, two of the tellers gave defendant "bait money"[1] and packets of money containing GPS trackers. The GPS trackers activated, allowing police to know the direction and speed of travel of the trackers and the stolen money that concealed the trackers. Using the information provided by the trackers and conveyed by dispatch, police stopped a black Dodge Charger in which defendant was the sole occupant. Among the items on the passenger seat of the Charger was

---

[1] Paul Praddel, Comerica's lead investigator in Michigan, explained at trial that bait money consists of five 10s and five 20s, of which the serial numbers have been recorded and the bills stamped with a teller's stamp that correlates with a stamp on the band binding the bills; the money is pre-recorded, pre-marked, and kept at the bank.

apparel matching the description of the clothes, gloves, and mask worn by the bank robber, and an empty conditioner or shampoo bottle; under the apparel was a bag of money containing the bank's bait money and the GPS trackers. Police arrested defendant and charged him with three counts of armed robbery, and one count of bank robbery. After a preliminary examination, the district court bound defendant over to the circuit court for further proceedings.

On July 2, 2015, the date scheduled for the final pre-trial conference, court-appointed defense counsel Raymond Correll told the trial court that defendant had asked for a new attorney. Defendant informed the court that Correll had been ineffective and had not properly advocated his case. Specifically, defendant accused Correll of failing to argue competently for dismissal of the armed robbery charges on grounds that no one saw a weapon or heard the robber make threats about having a weapon, of not asking him about witnesses for the preliminary examination, and of not providing him with complete transcripts of the preliminary investigation. Correll responded that he had in fact made arguments before the district court on the issues of armed robbery and bank robbery, visited defendant four times in jail, and provided preliminary examination transcripts. In addition, Correll said he had obtained a court order allowing him to take his laptop computer into the jail and had shown defendant surveillance video from the bank robbery, and he had requested dash cam video of the traffic stop of defendant's Charger. Correll told the trial court that he typically did not ask to withdraw from cases, but defendant had a pattern of asking for new attorneys and it might be best in this case for the trial court to allow him to withdraw. The trial judge told defendant that she knew Correll well, that he was one of the best lawyers to practice in her courtroom, and that she had not heard one scintilla of evidence that would compel the conclusion that Correll was "incompetent or not worthy" of representing defendant. The trial court noted that, in light of the record made, defendant could represent himself, but said it would not require defendant to make an immediate decision. Rather, the court adjourned the trial date and indicated that it would use the original trial date as a status conference to give defendant an opportunity to determine whether he wanted to represent himself or to hire an attorney of his choosing.

At the July 13, 2015 status conference, defendant twice asked Correll to "recuse" himself, adding to his prior accusations that Correll had not communicated with him since the bindover and that there was an irreparable breakdown in their relationship. Among defendant's other complaints was that Correll had not discussed strategy with defendant and had failed to move for dismissal of all charges based on the fact that the complaint warrant in defendant's discovery packet was unsigned. Defendant explained to the trial court that he was not asking for an attorney of his choice, just for one that would advocate for him. Asked to respond, Correll indicated that he and defendant had discussed strategy and that defendant had provided a factual defense that, if the jury believed it, could result in a not-guilty verdict. Correll also said that defendant had stopped communicating with him. The trial court again told defendant that there was no good cause to replace Correll. During the course of the hearing, the court informed defendant that he had the right to represent himself if he so chose, but recommended against it, noting that defendant was facing serious charges and self-representation would put him at a disadvantage; further, if the jury found him guilty, the sentencing guidelines called for at least 9-30 years in prison. After reiterating the importance of having adequate counsel, the court informed defendant that if he elected to represent himself, the court would appoint Correll as advisory counsel.

Also at the status conference, defendant asked Correll to file several motions that defendant had drafted. Asked whether he was going to represent himself, defendant said, "Well, at this point, I have no counsel because I fired him and there's a conflict of interest. When I do the motion, I'll—I'll—I did it down there. I'll do it here." Accordingly, at a September 9, 2015 motion hearing, defendant argued motions to replace Correll, to dismiss the charges due to the unsigned complaint warrant in defendant's discovery packet, to quash the armed robbery charges, and to suppress the evidence seized from his car because it resulted from a traffic stop made without probable cause. After oral argument by both parties on each motion, the trial court denied them all.

At every pretrial hearing, prior to voir dire, and during the trial, defendant asked the court to replace Correll. The essence of defendant's accusations remained the same: Correll had been "unenthusiastic" in his motion to dismiss on the ground of a faulty indictment, had not challenged the prosecution's case with regard to the armed robbery charges, had failed to challenge the validity of the traffic stop that resulted in defendant's arrest, and was working with the prosecution against defendant. Defendant insisted that Correll had provided ineffective assistance, and that there was an irreparable breakdown in the attorney-client relationship. The trial court denied defendant's motions to replace Correll, first as defense counsel and then as advisory counsel, on the ground that defendant had not shown good cause to replace him. The trial court repeatedly warned defendant that self-representation was not in his best interest, that the charges against him and the potential consequences of guilty verdicts were serious, and that Correll could provide adequate representation. Correll expressed his willingness to continue as defendant's defense counsel or as advisory counsel at the court's discretion. In addition to his repeated requests to dismiss Correll and a vigorous motion practice, defendant pursued and obtained a psychological evaluation and a plea agreement that he eventually rejected.

Defendant's trial began March 14, 2016, with defendant representing himself and Correll acting as advisory counsel. Defendant actively engaged in voir dire, gave an opening statement, cross-examined the prosecution's witnesses, called and examined defense witnesses, and gave a closing argument. Three tellers—Tiara Moore, Monique Shoulders, and Terri Smith—testified that they were present at the subject bank on the morning of March 11, 2015, when a man wearing a mask, a black hoodie, black jeans, and dark gloves entered the bank. Each woman said she was afraid because the robber was waving and pointing what she thought was a gun covered with a black cloth. Each woman testified that she complied with the robber's demand to give him her money; Shoulders and Smith also handed over their bait money and money concealing a GPS tracker. They all testified that after the robber took the money, he left the bank, ran behind the building toward the drive-thru area, hopped over a wall, and disappeared.

Southfield police officer Aaron Huguley testified that dispatch was broadcasting updates of the location of the tracking devices, and that they were traveling toward the intersection of Nine Mile Road and Lahser road. As Officer Huguley approached the intersection, he saw two vehicles: a Chrysler with two occupants, and a Dodge Charger one with one occupant. Based on the information he received from the tracking devices and dispatch's communication that police were looking for a lone suspect, the officer pulled behind the Charger, activated his lights, and made a traffic stop. Other officers arrived on the scene at about the same time, among them, Officer Jeffrey Medici. Officer Medici testified that while the other officers were taking defendant into custody, he walked around the Charger and observed black clothing bunched up

on the passenger seat. Knowing that police were looking for a lone male dressed in black, Officer Medici opened the door and observed several items of black clothing, brown gloves, a black do-rag, a blackened empty bottle of hair conditioner inside a jacket pocket, and "a plastic bag with a lot of US currency." Evidence technician and patrol officer Christopher Thomas testified that he recovered a white plastic bag full of money, a black do-rag, a black long-sleeved shirt, a black hoodie, a black pair of jeans, and an empty bottle of shampoo from the passenger seat of the Charger. He further testified that some of the money disguised a GPS tracker pack, which Paul Praddel, a lead investigator for Comerica Bank, identified as the bank's. Thomas also testified that Praddel identified among the money recovered two packs of the bank's bait money.

On cross-examination, defendant elicited testimony from the tellers that they did not see a gun, nor did the robber make any verbal threats involving a gun. Defendant also drew attention to alleged discrepancies in some of the witness's physical description of the robber at the time of the robbery and their description of the robber at trial. Defendant's theory of defense involved two men who allegedly befriended him at the casino the night before the robbery. Defendant gave them a ride in his Charger, dropping the first man off near the subject bank, and the second man at a house. While he was waiting for the second man to come out of the house, the person defendant believed to be the first man jumped into his car and told him to drive. Defendant drove off, but then struggled with the man and ejected him from the car while retaining the man's plastic bag. Defendant sought to establish this theory by asking Officer Thomas on cross-examination why he collected from the Charger only those items Thomas thought had evidentiary significance while leaving behind items defendant characterized as potentially exculpatory. Defendant viewed Thomas's discriminatory recovery of evidence as tantamount to suppressing evidence that defendant claimed would have proved his theory.

After closing arguments, the trial court instructed the jury in the law without objections from either party, and the jury deliberated for approximately three and a half hours before returning guilty verdicts on all charges. Subsequent to sentencing, defendant filed a motion for a new trial. At the motion hearing, defendant raised many of the same issues he had raised throughout the pretrial proceedings, adding allegations of identification tainted by suggestiveness, judicial bias, and judicial coercion of a verdict. The trial court denied the motion, and this appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first contends that the evidence presented at trial was insufficient to prove him guilty of the charged crimes beyond a reasonable doubt. We disagree. We review de novo a defendant's challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We "view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Hoffman*, 225 Mich App 103, 111; 570 NW2d 146 (1997).

## 1. IDENTIFICATION

Defendant first contends that the prosecution's evidence was insufficient to prove that he was the robber. We disagree. "[I]dentity is an element of every offense," *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008), and a defendant's identity as the perpetrator of the charged offenses must be proved beyond a reasonable doubt, see *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). The prosecution may establish identity by circumstantial evidence and any reasonable inferences therefrom. See *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999).

In the instant case, the prosecution used circumstantial evidence to establish the identity of the robber as defendant. All three tellers testified that the robber was wearing a black hoodie, black jeans, a black mask, and had something wrapped in a black cloth in his hand. Two tellers testified that they gave the robber a pack of money that concealed a GPS tracking device, Officer Huguley and Comerica's security officer described the path the money took according to the GPS tracker, and Officer Huguley testified that he apprehended a Dodge Charger based on information received from the GPS tracker and the car's number of occupants. Officer Huguley identified defendant as the driver of the Charger, and Officer Thomas recovered clothing, money, and the GPS trackers associated with the bank robbery from the Charger's passenger seat. Viewing this evidence in the light most favorable to the prosecution, *Hoffman*, 25 Mich App at 111, a rational trier of fact could infer beyond a reasonable doubt that defendant was the person who robbed the Comerica Bank.

## 2. ARMED ROBBERY

In order to establish the elements of armed robbery, MCL 750.529,[2] the prosecutor had to present evidence sufficient to prove the following beyond a reasonable doubt with respect to each bank teller:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous

---

[2] MCL 750.529 provides:

> A person who engages in conduct proscribed under [MCL 750.530] and who in the course of engaging in that conduct, possesses a dangerous weapon or an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon, or who represents orally or otherwise that he or she is in possession of a dangerous weapon, is guilty of a felony punishable by imprisonment for life or for any term of years.

weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007); see M Crim JI, 18.1.]

It is undisputed that no one saw the robber with a weapon or heard him threaten anyone with having a weapon, and police did not recover a weapon from defendant's Charger. Defendant repeatedly tried to establish through cross-examination that the videos of the robber demonstrated that the robber did not have an object in his hands, and that the only thing under the black cloth was the robber's hand and fingers. Thus, the question on appeal is whether using one's hand or fingers to feign a weapon satisfies the "armed" element of armed robbery. Under Michigan law, it does. Defendant errs to the extent he assumes that a conviction for armed robbery requires proof beyond a reasonable doubt that the perpetrator either was "actually armed with a dangerous weapon or actually armed with an article used or fashioned to induce a victim to reasonably believe that defendant was armed with a dangerous weapon." *People v Jolly*, 442 Mich 458; 502 NW2d 177 (1983). As the *Jolly* Court explained:

> The typical armed robbery case prosecuted under the feigned weapon method involves either the use of a toy gun or a finger or other object hidden in a bag or under a coat to simulate the appearance of a weapon together with threatening behavior and statements indicating the existence of a weapon. The existence of some object, whether actually seen or obscured by clothing or something such as a paper bag, is objective evidence that a defendant possesses a dangerous weapon or an article used or fashioned to look like one. Related threats, whether verbal or gesticulatory, further support the existence of a weapon or article. [*Jolly*, 442 Mich at 469-470 (citations omitted).]

Thus, under Michigan law, the prosecution need not present an actual weapon or an actual object that could be used as a weapon to satisfy the "armed" element; fingers or a hand obscured by some item and accompanied by verbal or gesticulatory threats can qualify as an "object." See *Id.* at 469.

In the present case, Moore, Shoulders, and Smith testified that the robber appeared to have an object in his hand wrapped in a cloth and that, based on the way he was dressed and the fact that he was waving and pointing it at them and demanding money, they thought it was a weapon. Thus, while it is undisputed that the robber never said that he had a weapon, the robber's appearance, gestures, and demands for the tellers' money supported the reasonable conclusion that he had a weapon or an article used or fashioned to make his victims believe that he had a weapon. *Jolly*, 442 Mich at 469-470. In addition, each of the tellers testified that she was present at the robbery, she complied with the robbery's demands to surrender the money in her till, and that she was scared. Viewing the evidence in the light most favorable to the prosecution, *Hoffman*, 225 Mich App 111, a rational trier of fact could find beyond a reasonable doubt that the prosecution proved three counts of armed robbery.

### 3. BANK ROBBERY

MCL 750.531 provides in relevant part that a person is guilty of bank robbery "who, with intent to commit the crime of larceny . . . shall put in fear any person for the purpose of stealing from any . . . bank . . . ." Accordingly, the trial court instructed the jury that, in order to establish

that defendant had committed bank robbery, the prosecution had to prove beyond a reasonable doubt that defendant put people in fear for the purpose of robbing the bank, and that he intended to rob the bank. As we have already indicated, the bank tellers testified that a masked robber entered the bank with what they believed to be a weapon, that they complied with his demand to give him their money, and that he exited the bank with money from their tills. Viewed in the light most favorable to the prosecution, *Hoffman*, 225 Mich App at 111, a rational trier of fact could conclude beyond a reasonable doubt that defendant intended to rob the bank and that he put people in fear for the purpose of robbing the bank, MCL 750.530. Therefore, the evidence was sufficient to convict defendant of bank robbery.

## B. SUBSTITUTE COUNSEL

Defendant next argues that the trial court committed reversible error by denying his repeated requests for substitute counsel without investigating the substance of those requests. Again, we disagree. We review for an abuse of discretion a trial court's decision regarding substitution of counsel. See *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Yost*, 278 Mich App at 379. Whether the trial court's denial of a defendant's request for new counsel constitutes an abuse of discretion depends on the facts and circumstances of each case. *People v Buie*, 298 Mich App 50, 67; 825 NW2d 361 (2012).

[T]he basic right to representation by counsel . . . encompasses the right to the appointment of different counsel when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic." *People v Charles O Williams*, 386 Mich 565, 574; 194 NW2d 337 (1972) (quotation marks and citation omitted). "[W]hen [a] defendant alleges the existence of a dispute leading to a destruction of communication and a breakdown in the attorney-client relationship, the judge is obligated to inquire whether such allegations are true." *People v Bass*, 88 Mich App 793, 802; 279 NW2d 551 (1979). However, as the Court explained in *Buie*, 298 Mich App at 67:

[A] defendant is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. A defendant is only entitled to a substitution of appointed counsel when discharge of the first attorney is for "good cause" and does not disrupt the judicial process. The circumstances that would justify good cause rest on the individual facts in each case. [Quotation marks and citations omitted.]

However, even if the trial court does not consider the defendant's allegations, "a defendant's conviction will not be set aside . . . if the record does not show that the lawyer assigned to represent [the defendant] was in fact inattentive to his [or her] responsibilities." *Id.*, quoting *People v Ginther*, 390 Mich 436, 442; 212 NW2d 922 (1973). Furthermore, "[a] defendant may not purposely break down the attorney-client relationship by refusing to cooperate with his assigned attorney and then argue that there is good cause for a substitution of counsel." *People v Meyers (On Remand)*, 124 Mich App 148, 166-167; 335 NW2d 189 (1983).

Defendant analogizes the instant case to *People v Wilson*, 43 Mich App 459; 204 NW2d 269 (1972). In *Wilson*, the defendant asserted that appointed counsel had not discussed the case

with him satisfactorily, prepared an adequate defense, or worked for the defendant's best interests, and the defendant maintained that he was apprehensive about giving his attorney the names of his alibi witnesses for fear that defense counsel was working with the prosecution. *People v Wilson*, 43 Mich App 459, 461; 204 NW2d 269 (1972). Observing that defendant's counsel was competent, the trial court denied the motion without considering the merits of the defendant's claims. *Id*. This Court found the trial court's assurances unresponsive to the defendant's assertions about the inadequacy of defense counsel's performance and the breakdown in communication, and the record inadequate to determine the truth of defendant's claim. *Id*. at 462. For these reasons, this Court concluded that the trial court had abused its discretion. *Id*. at 463.

In our view, the instant case is easily distinguishable from *Wilson*. Although defendant raises some of the same accusations against Correll that the *Wilson* defendant raised against his defense counsel, and the trial court in the present case repeatedly assured defendant that Correll was highly competent, the similarities end there. Unlike in *Wilson*, the record here shows the extent to which defendant's complaints against Correll arose from defendant's persistent, and in some instances willful, misapprehensions of the law and misrepresentations of the record. For example, defendant insisted that the district court, and then the trial court, did not have jurisdiction over his case because the complaint warrant in the discovery packet he received from the prosecution was unsigned, and that Correll had failed to raise this issue at the preliminary examination. However, the record shows to the contrary that Correll did raise the issue at defendant's request, and that the court's file contained a properly executed complaint warrant. Even after the trial court showed defendant the signed copy of the complaint warrant in its file, defendant continued to insist without any legal or factual basis whatsoever that the "indictment" was faulty and that, as a result, the court did not have subject matter jurisdiction.

Not only does the record show that defendant's accusations against Correll were baseless, it also shows that Correll did not abandon defendant's case, but continued to work on defendant's behalf. Correll attested to a number of visits with defendant prior to and after the preliminary examination and insisted that he was willing to pursue the factual defense defendant wanted to assert. The record shows that Correll obtained a court order allowing him to take his laptop into the jail and show surveillance videos of the bank robbery to defendant. Defendant's assertion that Correll played the videos on fast-forward confirms that Correll did visit him and play the videos. In addition, the record shows that Correll provided defendant with transcripts of the preliminary examination, and brought him clothes to wear to trial. Throughout the trial, Correll provided defendant procedural, strategic, and legal advice, most of which defendant ignored. Thus, although defendant's allegations against Correll echo the language used by defendants in *Wilson* and other Michigan cases where trial courts have abused their discretion by denying a defendant new court-appointed counsel, the record in this case does not support defendant's allegations. Defendant may not purposely break down the attorney-client relationship by refusing to cooperate with his appointed counsel and leveling unsubstantiated allegations against him and then assert good cause for a substitute counsel. *Meyers (On Remand)*, 124 Mich App at 166-167. Defendant did not show good cause entitling him to substitution of counsel; accordingly, the trial court did not abuse its discretion by denying his repeated motions. *Buie*, 298 Mich App at 67.

We also find unsupported by the record defendant's assertion that the trial court did not sufficiently investigate his allegations before denying his requests. The trial court was aware of the record and gave Correll and the prosecutor opportunities to respond to defendant's allegations. Given the particular nature of defendant's complaints against Correll, it is not clear what further investigation defendant presumes to be necessary. Moreover, assuming for the sake of argument that the trial court's consideration of defendant's allegations was inadequate, we would not overturn defendant's convictions because the record does not show that Correll was in fact inattentive to his responsibilities. *Id.*

## C. CONFRONTATION CLAUSE

Next, defendant argues that the trial court violated his constitutional right to confront the witnesses against him when it allowed Christopher Hill, a security guard on duty at Comerica, to testify that an employee of a nearby business told him that a person had just jumped the fence and gotten into a black Dodge Charger or Chevrolet Impala. Once again, we disagree.

"The Confrontation Clause of the Sixth Amendment states: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' The Fourteenth Amendment renders the Clause binding on the States." *Michigan v Bryant*, 562 US 344, 352; S Ct 1143, 1152; 179 L Ed 2d 93 (2011); Const 1963, art 1, § 20. Constitutional errors, including Confrontation Clause errors, are harmless if " ' "[it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." ' " *People v Shepherd*, 472 Mich 343, 347, 348; 697 NW2d 144 (2005), quoting *People v Mass*, 464 Mich 615, 640 n; 628 NW2d 540 (2001), quoting *Neder v United States*, 527 US 1, 19; 119 S Ct 1827; 144 L Ed 2d 35 (1999). As the United States Supreme Court has explained,

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [*People v LaLone*, 432 Mich 103, 131-132; 437 NW2d 611 (1989), quoting *Delaware v Van Arsdall*, 475 US 673, 684; 106 S Ct 1431, 1438; 89 L Ed 2d 674 (1986).]

After a thorough examination of the record, we conclude that, even if the trial court admitted Hill's testimony in error, the error was harmless beyond a reasonable doubt. Defendant was apprehended based largely on information supplied by GPS tracking devices concealed in the stolen money. There is no record evidence that Hill relayed the information he received from the employee to Comerica's security center, or that it was instrumental in law enforcement's apprehension of defendant. Officer Hughley testified that he received no information regarding the type of vehicle the suspect might have been driving. Given the strength of the prosecution's case without Hill's testimony, the relative insignificance of Hill's testimony, and the fact that other evidence corroborated his testimony, we find it "clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error." *Shepherd*, 472 Mich at 348

(quotation marks and citation omitted). Therefore, any Confrontation Clause error arising from admission of Hill's hearsay testimony was harmless beyond a reasonable doubt. *Id*. at 347.

## D. DUE PROCESS

Defendant asserts that he was denied a fair trial when the jury witnessed a deputy place him in shackles. The prosecution argues that defendant waived this issue when, after being made aware that some members of the jury may have observed a deputy putting him in a belly chain as the members were leaving the courtroom for lunch, defendant explicitly indicated his belief that none of the jurors saw what the deputy did and he was not prejudiced. We agree. The record shows that Correll drew the trial court's attention to the incident, and informed defendant that he could move for a new trial based on the deputy's action. Defendant's clear decision not to so move on grounds that he did not think any jurors saw what happened constitutes a waiver that extinguished any error, thus leaving nothing for this Court to review. *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000).

Moreover, even if defendant had not waived the issue, his claim would have failed because he has not shown prejudice. *People v Horn*, 279 Mich App 31, 37; 755 NW2d 212 (2008) (indicating that where jurors briefly and inadvertently see a defendant in shackles, "there must still be some showing that the defendant was prejudiced"). "In order to demonstrate prejudice, a defendant must present evidence of *actual and substantial prejudice*, not mere speculation." *People v Woolfolk*, 304 Mich App 450, 454; 848 NW2d 169 (2014) (emphasis added). Accordingly, defendant's speculation that jurors might have scrutinized the credibility of the evidence more carefully had they not observed the shackling is insufficient to establish the actual and substantial prejudice necessary to sustain a claim of reversible error base on a violation of one's right to due process. *Id*.

## E. ISSUES RAISED IN DEFENDANT'S STANDARD 4 BRIEF[3]

### 1. RIGHT TO COUNSEL

Defendant argues that the trial court committed reversible, structural error by violating his Sixth Amendment right to legal representation. Specifically, defendant contends that he never waived his right to counsel or asked to represent himself, and that the trial court simply told defendant that he was going to represent himself, without complying with any of the requirements of MCR 6.005. Because this issue comes to the Court unpreserved, our review is for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750 762; 597 NW2d 130 (1999). An error affects substantial rights if it affected the outcome of the proceedings, and it either resulted in the conviction of an innocent person or seriously affected the fairness, integrity or public reputation of the proceedings, *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003).

---

[3] A "Standard 4" brief refers to a brief filed *pro se* by an indigent criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4.

Defendant's framing of the issues misrepresents the record. As we explained elsewhere in this decision, when defendant failed to make the showing necessary to obtain substitute counsel, the trial court gave him the option of cooperating with appointed counsel, representing himself, or retaining counsel, and gave him time to think about the decision. Although defendant asserted that his "first choice" was for substitute counsel, he unequivocally indicated to the trial court that, given the option of Correll's representation or self-representation, he chose the latter. Defendant indicated at the July 13, 2015 status conference that he had "fired" his court-appointed attorney and would handle matters himself. From that point onward, defendant engaged in a vigorous motion practice, arranged for a psychological evaluation, and asked for and received the offer of a plea agreement from the prosecution.

In addition, the record shows that defendant made this decision after the trial court fully and repeatedly informed him of the disadvantages of self-representation, the seriousness of the charges against him, and the likely sentence should the jury find him guilty as charged. MCR 6.005(D)(1).[4] Moreover, the record shows that Correll was available to defendant for consultation while he was making the decision. MCR 6.005(D)(2). Further, the record does not support defendant's implication that he asked Correll to take over his representation during the course of the trial, but Correll refused and the trial court supported his decision. Defendant did not ask Correll to resume representing him, he simply asked Correll to cross-exam one of the witnesses by reading questions that defendant would write. In an exercise of its inherent authority to control the course of a trial, MCL 768.29, the trial court made clear that defendant was going to conduct the cross-examination, but told him he could consult with Correll and seek input if he was unsure how to phrase his questions. This being unsatisfactory to defendant, he declined to consult with counsel and said he would conduct the cross-examination himself. At no point did defendant indicate to either Correll or the trial court that he wanted Correll to resume representation of him.

It is true that defendant maintained that his first choice was not self-representation, but rather, the appointment of substitute counsel. However, unable to make the showing necessary to obtain substitute counsel, unwilling to cooperate with appointed counsel, and informed of the

---

[4] MCR 6.005(D) provides in relevant part:

The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first

(1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

(2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

risks of representing himself, the charges against him, and the potential sentence if the jury found him guilty on all charges, defendant knowingly, intelligently, and voluntarily elected to represent himself, and communicated his choice in word and deed. Accordingly, defendant's claim that the trial court allowed him to represent himself without complying with MCR 6.005(D) fails.

## 2. PROSECUTORIAL MISCONDUCT

Defendant alleges several instances of prosecutorial misconduct. Because he did not preserve any of them with a contemporaneous objection *and* request for a curative instruction, *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010), our review is limited to ascertaining whether there was plain error that affected substantial rights, *Carines*, 460 Mich at 762.

Defendant alleges that the prosecutor used "suggestive identification" techniques when he told witnesses that "the robber" was going to represent himself at trial, and he impermissibly coached witnesses by showing them surveillance video of the bank robbery prior to trial. The record does not support defendant's assertion that the prosecution told witnesses "the robber" was representing himself. To the extent that the prosecutor admittedly prepared witnesses for trial by telling them that defendant would cross-examine them and by showing them video from the bank robbery, defendant cites no relevant authority prohibiting either. The prosecution elicited testimony from each of the bank tellers that they had watched the videos earlier in the week of the trial. Thus, to the extent that the prosecution's preparation of the witnesses goes to the credibility of their testimony, the credibility of witnesses and the weight to give their testimony is a matter for the trier of fact. See *People v Lemmon*, 456 Mich 625, 646; 576 NW2d 129 (1998).

Equally unpersuasive is defendant's assertion that the prosecutor improperly vouched for the credibility of witnesses. A prosecutor may argue from the facts in evidence that the jury should believe a witness, but a prosecutor may not vouch for the credibility of a witness by suggesting that he or she has some special knowledge that the witness is testifying truthfully. *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). After reviewing the instances defendant labels as improper vouching, we conclude that the prosecutor was merely arguing from the facts in evidence, and that at no time did he suggest that he had some special knowledge that the witnesses were testifying truthfully. See *id*.

Next, contrary to defendant's accusation, the prosecutor did not impermissibly give his own opinion when he reviewed the evidence admitted at trial and stated that he had met his burden to prove the charges against defendant beyond a reasonable doubt. The prosecutor was not asking the jury to convict defendant on the basis of the prosecutor's opinion or knowledge, see *People v Ignofo*, 315 Mich 626, 631-636; 24 NW2d 514 (1946), but on the basis of the evidence adduced at trial.

Likewise, the prosecutor did not misrepresent facts or argue facts not in evidence when, in his closing argument, he stressed testimony indicating the tellers' belief that the bank robber had a weapon in his hand. While prosecutors may not make statements of fact to the jury that are unsupported by the evidence, *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994), they are free to argue the evidence and all reasonable inferences arising from it as they relate to

his theory of the case *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Here, the prosecution argued from facts in evidence and reasonable inferences from those facts. Fairly stressing evidence unfavorable to defendant does not constitute prosecutorial misconduct. See *People v Fisher*, 449 Mich 441, 452; 537 NW2d 577 (1995).

Finally, the record does not support defendant's assertion that the prosecutor misled the jury by incorrectly reciting the elements of armed robbery and telling the jury that they had been met. Even if the prosecutor had misstated the law—which he did not—any error was corrected by the trial court's proper statement of the elements and instruction to the jurors that it was their duty to follow the law as given by the trial court. We presume that jurors follow the trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Having thus found no instances of prosecutorial misconduct, defendant's claim that the cumulative effect of the prosecutor's errors undermined the presumption of innocence necessarily fails.

### 3. JUDICIAL BIAS

Defendant next contends that the trial court judge's praise of defense counsel's abilities demonstrated extrajudicial bias requiring remand for a new trial before a different judge. "A trial judge is presumed unbiased, *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153 (2012), and to prevail on his assertion to the contrary, defendant must prove that the judge "harbors actual bias or prejudice for or against a party or attorney that is both personal and extrajudicial." MCR 2.003(B)(1); *Van Buren Twp v Garter Belt Inc*, 258 Mich App 594, 598; 673 NW2d 111 (2003) (2004). Defendant fails to meet this burden. The record indicates that the trial judge based her opinion of Correll on Correll's skill as an attorney and her first-hand observation of his advocacy in her courtroom. Further, as already discussed, defendant never established any of his allegations that Correll was not providing him with effective assistance. On the record before this Court, the trial judge's denial of defendant's motions for a new court-appointed attorney does not establish bias or prejudice, not to mention bias or prejudice that is personal and extrajudicial, as is required for disqualification. *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009) (noting that the mere fact that the judge ruled against a litigant is not sufficient to require disqualification).[5]

### 4. PROBABLE CAUSE

Defendant next contends that, because Officer Huguley did not have probable cause to stop his vehicle or arrest him, the trial court should have suppressed the evidence retrieved from his vehicle as being the product of an unconstitutional seizure. We disagree. This Court reviews a trial court's factual findings in a suppression hearing for clear error and it will affirm those facts unless it is "left with a definite and firm conviction that a mistake was made." *People v*

---

[5] Defendant also asserts that the trial judge attempted to "manipulate the jury" into returning guilty verdicts. However, defendant's standard 4 brief provides no explanation or argument in support of this allegation. Accordingly, we consider the issue abandoned. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004) ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue.").

-13-

*Simmons*, 316 Mich App 322, 325; 894 NW2d 86 (2016) (quotation marks and citation omitted). This Court reviews de novo the trial court's ultimate ruling on a motion to suppress. *Id*.

Stopping a vehicle and detaining the occupant constitutes a seizure under the Fourth Amendment. *Id*. at 326. "A traffic stop is justified if the officer has an articulable and reasonable suspicion that a vehicle or one of its occupants is subject to seizure for a violation of law. *Id*. This includes, but is not limited to, a violation of a traffic law. *Id*. Further, "[t]he determination of whether a traffic stop is reasonable must necessarily take into account the evolving circumstances with which the officer is faced." *Id*. (quotation marks and citation omitted). "Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *People v Cohe*n, 294 Mich App 70, 75; 816 NW2d 474 (2011) (quotation marks and citation omitted).

Officer Huguley's testimony that he decided to execute a traffic stop of defendant's Charger based on information received from the GPS trackers and reports that police were looking for a lone suspect demonstrated an "articulable and reasonable suspicion" that the Charger and its occupant were subject to seizure for a violation of the law. *Simmons*, 316 Mich App at 36. In addition, Officer Medici observed evidence associated with the robbery on the passenger seat of the Charger. These facts and circumstances, known to Huguley, were "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Cohen*, 294 Mich App at 75 (quotation marks and citation omitted). The record shows that Huguley had an articulable and reasonable suspicion that defendant had violated the law and, therefore, was subject to seizure, and probable cause existed to arrest defendant on suspicion of having committed the bank robbery. Accordingly, we conclude that the trial court's denial of defendant's motion to suppress was not error.

### 5. JURISDICTION

Finally, defendant argues that the trial court should have dismissed the charges against him based on the prosecutor's failure to sign the complaint warrant in defendant's discovery packet. Both the district court and the circuit court confirmed that police arrested defendant pursuant to a complaint warrant properly signed and dated by a magistrate and the prosecuting attorney; the trial court even showed defendant the document in the court's file. Thus, defendant's implication that he was arrested pursuant to an invalid warrant finds no support in the record.[6]

Because the remainder of the errors defendant alleges are wholly without merit, we decline to address them. Defendant has failed to establish errors, and absent the establishment of

---

[6] Defendant has abandoned on appeal his claim that there is no enacting clause for the law cited against him as he provides no specific argument related to that issue. *People v Eisen*, 296 Mich App 326, 331-332; 820 NW2d 229 (2012).

errors, we find no cumulative effect of any errors meriting reversal. *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

Affirmed.

/s/ Jane M. Beckering
/s/ Colleen A. O'Brien
/s/ Thomas C. Cameron